# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DEBRA STOE,

        *Plaintiff*,

        v.

JEFF SESSIONS,
ATTORNEY GENERAL,
U.S. DEPARTMENT OF JUSTICE,

        *Defendant*.

Civil Action No. 16-1618 (JDB)

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

October 27, 2017

JESSIE K. LIU
D.C. Bar 472845
United States Attorney

DANIEL F. VAN HORN
D.C. Bar 924092
Chief, Civil Division

DANIEL P. SCHAEFER
D.C. Bar 996871
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2531
Daniel.Schaefer@usdoj.gov

## TABLE OF CONTENTS

Introduction ................................................................................................................. 1

Factual Background ....................................................................................................... 3

    A.    Desk Audit Requests to Reclassify Plaintiff's Position to GS-15 ........................ 3

    B.    Non-Selection for Supervisory Program Manager Position ................................. 4

        1.    Generation of the Certificate Lists ............................................................. 5

        2.    Composition of the Interview Panel ........................................................... 7

        3.    Initial Screening of Applicants ................................................................. 8

        4.    The Interviews ...................................................................................... 9

        5.    The Selection Decision .......................................................................... 10

Legal Standards ........................................................................................................... 11

    A.    Motions for Summary Judgment ...................................................................... 11

    B.    The *McDonnell Douglas* and *Brady* Framework for Discrimination
        Claims Under Title VII and the ADEA .............................................................. 13

Argument .................................................................................................................... 14

I.    Defendant Proffers a Legitimate Reason for the Non-Selection ................................. 14

II.    Plaintiff Has Adduced Insufficient Evidence for a Reasonable Jury to Conclude
    That Defendant's Reason for the Non-Selection Is Pretextual ................................... 16

    A.    A Reasonable Jury Would Not Conclude That Plaintiff Was Significantly
        Better Qualified Than the Selectee ................................................................... 16

    B.    The Undisputed Record Evidence Further Undercuts Any Inference of
        Discrimination .............................................................................................. 20

        1.    Plaintiff's Claims Are Improbable, Conclusory, and Speculative ........... 21

        2.    The Selecting Official Favored a Candidate of the Same Protected
            Class as Plaintiff .................................................................................. 23

        3.    Two Members of the Panel Share Protected Characteristics with
            Plaintiff .............................................................................................. 25

        4.    An Unchallenged Member of the Panel Found Plaintiff and the
            Selectee To Be Equally Qualified .......................................................... 26

Conclusion .................................................................................................................. 27

# TABLE OF AUTHORITIES

**Cases**

*Adeyemi v. District of Columbia,*
    525 F.3d 1222 (D.C. Cir. 2008) ........................................................................ 16

*Aka v. Wash. Hosp. Ctr.,*
    156 F.3d 1284 (D.C. Cir. 1998) ......................................................... 16, 17, 25

*Allen v. Johnson,*
    795 F.3d 34 (D.C. Cir. 2015) ........................................................................... 11

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ................................................................................... 11, 12

*Ash v. Tyson Foods, Inc.,*
    546 U.S. 454 (2006) .......................................................................................... 16

*Bell v. Donley,*
    928 F. Supp. 2d 174 (D.D.C. 2013) ................................................................. 24

*Bonieskie v. Mukasey,*
    540 F. Supp. 2d 190 (D.D.C. 2008) ................................................................. 12

*Brady v. Office of Sergeant at Arms,*
    520 F.3d 490 (D.C. Cir. 2008) ................................................................... 13, 14

*Brown v. Brody,*
    199 F.3d 446 (D.C. Cir. 1999) ......................................................................... 24

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ................................................................................... 11, 12

*Equal Rights Ctr. v. Post Props., Inc.,*
    633 F.3d 1136 (D.C. Cir. 2011) ....................................................................... 12

*Fischbach v. D.C. Dep't of Corr.,*
    86 F.3d 1180 (D.C. Cir. 1996) ......................................................................... 17

*Glass v. Lahood,*
    786 F. Supp. 2d 189 (D.D.C. 2011) .......................................................... passim

*Greene v. Dalton,*
    164 F.3d 671 (D.C. Cir. 1999) ......................................................................... 13

*Grosdidier v. Broad. Bd. of Governors, Chairman,*
    709 F.3d 19 (D.C. Cir. 2013) ........................................................................... 16

*Hammond v. Chao,*
    383 F. Supp. 2d 47 (D.D.C. 2005) ................................................................. 25

*Horvath v. Thompson,*
    329 F. Supp. 2d 1 (D.D.C. 2004) ............................................................. 25, 26

*Jackson v. Gonzales,*
    496 F.3d 703 (D.C. Cir. 2007) ...................................................................... 16

*Kilby-Robb v. Devos,*
    247 F. Supp. 3d 115 (D.D.C. 2017) .............................................................. 14

*Lash v. Lemke,*
    786 F.3d 1 (D.C. Cir. 2015) ..................................................................... 12, 18

*Manuel v. Potter,*
    685 F. Supp. 2d 46 (D.D.C. 2010) ................................................................ 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ...................................................................................... 12

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973) ...................................................................................... 13

*Milton v. Weinberger,*
    696 F.2d 94 (D.C. Cir. 1982) ........................................................................ 17

*Montgomery v. Gotbaum,*
    920 F. Supp. 2d 73 (D.D.C. 2013) ................................................................ 24

*Moore v. Pritzker,*
    204 F. Supp. 3d 82 (D.D.C. 2016) ................................................................ 21

*Murray v. Gilmore,*
    406 F.3d 708 (D.C. Cir. 2005) ...................................................................... 24

*Oliver-Simon v. Nicholson,*
    384 F. Supp. 2d 298 (D.D.C. 2005) .............................................................. 25

*Porter v. Shah,*
    606 F.3d 809 (D.C. Cir. 2010) ...................................................................... 16

*Ranowsky v. Nat'l R.R. Passenger Corp.,*
    244 F. Supp. 3d 138 (D.D.C. 2017) .............................................................. 25

*Rosaura Bldg. Corp. v. Municipality of Mayaguez,*
    778 F.3d 55 (1st Cir. 2015) ........................................................................... 21

iv

*Scott v. Harris*,
    550 U.S. 372 (2007)...................................................................................... 21, 22, 23

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502 (1993) ............................................................................................. 13

*Texas Dep't of Cmty. Affairs v. Burdine*,
    450 U.S. 248 (1981) ............................................................................................. 14

*Walker v. Dalton*,
    94 F. Supp. 2d 8 (D.D.C. 2000) ...................................................................... 24, 25

*Washington v. Chao*,
    577 F. Supp. 2d 27 (D.D.C. 2008) ....................................................................... 25

**Statutes**

29 U.S.C. § 621 ........................................................................................................... 1

29 U.S.C. § 633a(a)..................................................................................................... 13

42 U.S.C. § 2000e ........................................................................................................ 1

42 U.S.C. § 2000e-16(a) ............................................................................................. 13

**Introduction**

Plaintiff Debra Stoe brings this action against the Department of Justice ("Department" or "DOJ") pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"). Plaintiff alleges that the Department discriminated against her on account of her age and sex when the Department selected a younger, male candidate for the Supervisory Program Manager position in DOJ's Office of Justice Programs ("OJP"), National Institute of Justice ("NIJ"), Office of Science and Technology ("OS&T").

Defendant moves for summary judgment under Federal Rule of Civil Procedure ("Rule") 56. The controlling legal authority and analogous cases in this jurisdiction, together with the summary judgment record in this matter, establish that there is no genuine dispute as to any material fact and that Defendant is entitled to judgment as a matter of law. Having proffered a legitimate reason for the non-selection, namely, that OS&T selected a better-qualified candidate, it is incumbent upon Plaintiff to come forward with sufficient evidence from which a reasonable jury could conclude that Defendant's proffered reason is pretextual and that its real motivation was discrimination based on Plaintiff's sex and age. Plaintiff has adduced no such evidence in this case. Plaintiff attempts to make out a case based on the comparative qualifications of her and the selectee, but she falls far short of establishing that there was a gap in their qualifications, not to mention one that was of such a magnitude as to be inherently indicative of discrimination.

While this first conclusion alone suffices to grant summary judgment in Defendant's favor, it becomes inescapable after other undisputed facts in the record are considered. Plaintiff, without any evidence in support of her belief, sees discriminatory intent at every turn. Even when the selecting official took affirmative steps during the selection process to ensure that

Plaintiff had an opportunity to interview for the position (and the undisputed facts show that if the official had not intervened on her behalf that Plaintiff would not have received an interview), Plaintiff attributes an unlawful motive.  This very same selecting official spent several years forcefully advocating for Plaintiff's current non-supervisory position to be reclassified from a GS-14 to a GS-15, but to no avail.  That, too, resulted in Plaintiff filing an EEO complaint against him, in which she argued that the selecting official did not try hard enough.

Any discriminatory inference from the selecting official's actions is even further weakened considering that the selecting official's top choice for the position was another female candidate who was six years older than Plaintiff.  In the final scoring, the selecting official had the other female candidate tied with the selectee for first place in his ranking.  The selectee was chosen because the other two members of the panel – one male, one female – favored the selectee over the selecting official's other choice.  In addition, two of the three members of the panel shared Plaintiff's protected characteristics.  The selecting official, a male, is only one year younger than Plaintiff, which undercuts her argument that he was discriminating against her on account of her age.  And it was actually the one female member of the panel, not the selecting official, who had the strongest preference for the selectee over Plaintiff.  That also undercuts an inference that she or the selecting official discriminated against Plaintiff on account of her sex.  Indeed, even the one member of the panel whose scoring Plaintiff does *not* challenge as discriminatory found Plaintiff and the selectee to be *equally qualified*.  These and the other facts discussed herein establish conclusively that no reasonable fact-finder could infer discriminatory intent from the panelists' scoring that resulted in the non-selection.

## Factual Background[1]

The claims in this case arise out of Plaintiff's non-selection for the Supervisory Program Manager position within OS&T.  Plaintiff, Debra Stoe, a female, born in 1954, is employed in OS&T as a Physical Scientist.  Def.'s SMF ¶¶ 1–3.  Plaintiff was 60 years old when she applied to the Supervisory Program Manager position in April 2014.  *Id.* ¶ 23.  The selecting official, Chris Tillery, a male, was 59 years old at the time of the non-selection in July 2014, and approximately one year younger than Plaintiff.  *Id.* ¶ 24.

### A.   Desk Audit Requests to Reclassify Plaintiff's Position to GS-15

In May 2012, Plaintiff's first-line supervisor, Dave Hart, and her second-line supervisor, Chris Tillery, put forward a formal request for a desk audit.  *Id.* ¶ 9.  Hart and Tillery requested that Plaintiff's current position be reclassified from a GS-14 to a GS-15, because they both believed that Plaintiff was performing GS-15 level work.  *Id.* ¶ 10.  The first request was denied by the NIJ Director, John Laub, later that year.  *Id.* ¶ 11.  Tillery renewed the desk audit request with Laub's replacement, NIJ Acting Director Greg Ridgeway, in 2013 and 2014.  *Id.* ¶¶ 12–14. Ridgeway denied the request because, like Laub, he did not want to add a non-supervisory GS-15 position in NIJ.  *Id.* ¶ 15.  Accordingly, Ridgeway directed Tillery to remove any GS-15 level work from Plaintiff's duties.

While Plaintiff no longer asserts a discrimination claim in connection with the desk audit requests,[2] Plaintiff clearly blamed Tillery for the fact that her position was never reclassified to a

---

[1] This background section summarizes the evidence discussed more fully in Defendant's Statement of Material Facts Not in Genuine Dispute ("SMF"), filed herewith.

[2] Plaintiff's administrative complaint included a claim that she had been discriminated against on account of her sex, age, and sexual orientation because she had not been appropriately compensated for performing GS-15 level work.  *See* EEO Compl. at 2, Oct. 20, 2014 (Ex. 52).  The administrative complaint also included a non-selection discrimination claim on account of sex, age, and sexual orientation.  In this case, Plaintiff asserts a non-selection discrimination claim on account of age and sex only (and not sexual orientation, as alleged in the administrative complaint).  *See* Compl. at pp. 5–6 (ECF No. 1).

GS-15.  *See* D. Stoe Dep. at 59:7–62:6, 63:2–12 (Ex. 1); D. Stoe Decl. ¶ 11(b) (Ex. 2).  Yet,

Plaintiff acknowledged in her deposition that it was not Tillery's decision to make and that she

did not know why the desk audit requests had been denied when she filed her administrative

complaint.  She was not privy to the discussions between Tillery and his superiors.  Stoe Dep. at

52:3–17–54:11, 65:8–66:23 (Ex. 1).  Plaintiff could find no fault in the documentation that

Tillery and Hart provided in support of the desk audit request.  *Id.* at 69:2–77:24.  Plaintiff also

admitted that there was no basis for the claim she made in a previous declaration that Tillery

worked harder to promote males.  *Id.* at 61:1–65:3.[3]  The record thus establishes that Plaintiff

perceived that she had been treated unfairly by Tillery, and that he had discriminated against her,

even before she had applied to the Supervisory Program Manager position.  *See* Stoe Decl., Ex. 2

at 6–10.

### B.  Non-Selection for Supervisory Program Manager Position

In March 2014, right around the time that Ridgeway denied the second desk audit

request, Hart announced that he was leaving DOJ.  *Id.* ¶ 16.  This opened up a new GS-15

Supervisory Program Manager position within OS&T.  *Id.* ¶¶ 17–18.  Plaintiff applied to the

vacancy in April 2014.  *Id.* ¶ 23.

The vacancy announcement identified five Knowledge, Skills, and Abilities ("KSAs") for

the Supervisory Program Manager position: (1) ability to develop and promote a diverse

workforce; (2) ability to supervise; (3) ability to analyze organizational and operational problems

---

[3] *See also* Stoe Decl., Ex. 2 at pp. 2–10 (asserting that Tillery discriminated against her by not upgrading her classification to the GS-15 level); *id.* at p. 7 ("I found his [Tillery's] efforts to be superficial, considering his ability to successfully execute detailed strategies when it came to promoting my male colleagues."), *id.* at p. 9 ("I believe Mr. Tillery was willing to allow me to perform GS-15 work, and that I performed that work well, but because of a combination of my sex, age and sexual orientation, was not willing to appoint me to the GS-15 level.").

and develop solutions; (4) knowledge of program management principles; and (5) ability to provide advice and guidance on business and program management issues.  *Id.* ¶ 20.

### 1.      *Generation of the Certificate Lists*

Plaintiff was among 77 candidates on an active certificate list of qualified candidates who were referred by OJP Human Resources ("HR") to the selecting official, Chris Tillery, on June 3, 2014.  *Id.* ¶ 36.  Tillery had the previous month received from HR a competitive promotion certificate list with only 18 candidates.  *Id.* ¶ 31.  That list (which was actually the second such list that the HR representative generated, due to an earlier error) did not include Mark Greene (the selectee), Plaintiff (who eventually finished second), or Kathleen Higgins (who eventually finished third, behind Greene and Plaintiff).  *Id.*

On May 21, 2014, after receiving the list of referred candidates, Tillery sent an email to several HR representatives in which he stated that he did not think that any of the candidates on the active certificate lists would be selected for an interview and asked if there was a way to expand the pool of candidates.  *Id.* ¶¶ 33–34.  Tillery specifically noted that Kathleen Higgins, who "would seem to be an almost ideal candidate," did not make the initial cut.  *Id.*  Tillery asked, "Can I get Ms. Higgins in front of the panel for consideration?"  *Id.*

Tillery's May 21, 2014, email was later released to Plaintiff in response to a request that she made under the Freedom of Information Act.  *Id.* ¶ 34.  Because Higgins' name and identifying information, and indeed much of the content of the email, had been redacted from the release, Plaintiff assumed, incorrectly, that Tillery was referring to the selectee, Mark Greene.  *Id.*  In fact, Tillery was not referring to Greene, but rather Higgins, a female who is approximately six years older than Plaintiff.  *Id.*  In his final scores, Tillery rated Higgins and Greene equally, and he said he would have been pleased to select either candidate.  *Id.* ¶ 67.

5

Further compounding her misapprehension of the situation, Plaintiff also mistakenly believed that she was on at least one of the four active certificate lists, and therefore eligible to be interviewed, when Tillery sent the May 21, 2014, email.  Stoe Dep. 88:3–96:24 (Ex. 1).  When Tillery stated that none of those candidates on the lists were "ideal," therefore, she interpreted that as meaning that Tillery thought that she (Plaintiff) was not ideal.  *Id.* at 92.  Yet the undisputed record facts establish that Plaintiff was not eligible to be interviewed from any of the four active certificate lists to which Tillery was referring.  As noted above, the Competitive Promotion Certificate that Tillery had received from HR, which only included 18 candidates, did not include Plaintiff (or Higgins or Greene).  *Id.* ¶ 31 (Active List No. 1).  While Plaintiff's name was on a separate DEU Certificate, Tillery could not have selected Plaintiff from that list because she is not a veteran.  *Id.* ¶ 28 (Active List No. 2).  She was not eligible for the Non-Competitive Promotion Certificate, because she was not a GS-15.  *Id.* ¶ 31 (Active List No. 3).  Nor was she a Schedule A Candidate.  *Id.* ¶ 29 (Active List No. 4).[4]  But for Tillery's request to expand the competitive promotion certificate list, therefore, Plaintiff would not have received an interview in the first place.  *Id.* ¶¶ 27–36.

Yet, while acknowledging that the documents establish that she was not among the candidates on the competitive promotion certificate list, and while also admitting that she has no reason to dispute the explanation that the HR representatives provided concerning the generation of the various certificate lists, Plaintiff still asserts that Tillery somehow discriminated against her when he requested that HR expand the list of pre-screened candidates:

> Q.    Mr. Tillery has testified in his declaration in this ROI that when he was saying there were no ideal candidates that that . . . didn't include your application.  So, what I'm . . . ask[ing] you . . . is whether you're alleging that [with]

---

[4] There was also a separate Competitive Promotion Certificate that had been generated by HR in error.  That list was immediately inactivated and Tillery could not use that list.  *Id.* ¶ 30.

this initial screening and the fact that there were multiple notices -- are you alleging that there was something discriminatory about that aspect of the selection process?

      A.     What I'm saying is that this justification that was written to support Chris' request [referring to Ex. 14 at 2] is inaccurate. This justification says that there was changes made to the merit promotion certificate. I'm saying that there were four certificates issued, and I was among the four, not the merit promotion but among the others, so -- which is why he refers to the initial certificates. So, when Chris says that -- that none of them exhibited the ability to serve as one of the two alternatives, was ideal, I believe he was discriminating against me. [ . . . ]

      Q.     And you . . . understand him, when []he says none of the candidates were ideal, you understand that to include you[?]

      A.     Absolutely.

Stoe Dep. 95:19–96:2, 96:8–96:24 (Ex. 1). Plaintiff is therefore incorrect that only the male candidates, Mark Greene and Joe Heaps, benefited from Tillery's request to expand the certificate list. *Id.* at 101:1–11, 131:13–134:3.[5] This was not the last time that Plaintiff benefited directly from Tillery's intervention during the selection process.

### 2.   *Composition of the Interview Panel*

The selection panel was comprised of three individuals: Chris Tillery (male, age 59; and the selecting official),[6] Gordon Gillerman (male, age 49), and Maria Swineford (female, age 36). *Id.* ¶ 24. Tillery had served as the Director of OS&T and Plaintiff's second-level supervisor since 2010. *Id.* ¶¶ 8, 10. Gillerman was the Acting Director of the Standards Coordination Office at the National Institute of Standards and Technology ("NIST"), a separate federal

---

[5] "[W]hat I've already mentioned is -- it's my belief that I was among the first -- I was on the first 3 certificates, plural, that were issued, and when you come down to -- he [Tillery] asked for this to be opened up, because when you come down to the third paragraph, where it says, 'All [OJP] applicants on the certificate must be interviewed.' So, if -- if neither Mark [Greene] or Joe [Heaps] had been on the certificate that I was included on, then they would not have been able to receive an interview. That's my belief. And I believe that Chris [Tillery] generated this email to justify that, even though it's not accurate." *Id.* at 101:1–11; *see also id.* at 131:13–134:3 (*e.g.*, "Q. And does the . . . fact that – now that we've looked at the portion of the email that was redacted, where Mr. Tillery appears to be advocating for Ms. Higgins to be added to the list of certified candidates, does that change your view? A. No. Q. Why not? A. I don't understand it, but it doesn't change my view. I don't know why he said that about Ms. Higgins, but it doesn't change my view.").

[6] All of the ages of the individuals referenced herein are as of the date of the non-selection in July 2014.

agency. *Id.* ¶ 25.  Gillerman did not work with Plaintiff on a daily basis, but he knew Plaintiff

well enough that she listed him as a reference on her application for the position. *Id.*  Swineford

was the Deputy Director of the Grants Management Division within OJP; she had not met

Plaintiff prior to the interview. *Id.* ¶ 26.

### 3.   *Initial Screening of Applicants*

Tillery divided the applicants equally among the three members of the panel. *Id.* ¶¶ 38,

40.  The panelists then conducted an initial screening of the candidates' written applications to

determine who would be selected for an interview. *Id.*  Plaintiff's application was assigned to

and reviewed by Swineford. *Id.* ¶ 41.  Initially, Swineford did not recommend Plaintiff for an

interview because she thought that Plaintiff lacked the requisite supervisory experience. *Id.* ¶ 44.

Tillery (and perhaps Gillerman) overrode Swineford's initial assessment that Plaintiff lacked the

qualifications for the position. *Id.* ¶¶ 45–46.  Swineford agreed to change her scoring, which

resulted in Plaintiff receiving an interview. *Id.* ¶ 46.

Here, Plaintiff attributes another unlawful motive to Tillery (and possibly to Swineford,

too).  Plaintiff believes that Tillery asked Swineford to increase *Plaintiff's* score because it was

the only way that he could get *Greene* in front of the interview panel:

> Q.     Is there anybody else in addition to Mr. Tillery who you believe
> discriminated against you in this selection process?
>
> A.     Maria [Swineford].
>
> Q.     Tell me a little bit more about that.  Why do you think Maria
> discriminated against you?
>
> A.     When I read the additional documents that came with the [ROI], it
> was clear to me that, okay, Chris [Tillery] somehow managed to convince Maria
> [Swineford], because when he says I'm going to separate the 77 [candidates] and
> he did that – and this is in the documents, and you can find it – he sent my name to
> Maria.

Well, her first record that came back had me down as a zero, which meant, guess what, I didn't get an interview. Well, guess what? There was no way that Gordon Gillerman was going to say that Mark [Greene] or Joe Heaps was qualified to do this job, because Gordon Gillerman is an expert in standards and testing and methodologies, right? He was with me when we built the body armor standard. No way was he going to say either of those two people [Greene and Heaps] were qualified to do this job.[7]

So, now, Chris is in a position where no one – he can't get Mark in front of the interview panel. He can't get [Greene] in there, because there's no way that Gillerman was going to do it. So, he goes to Maria and he says I need you to change Debra's score so I can get her in front of the panel, and if I can get her in front of the panel, then I can get Mark and Joe in front of the panels, and that's exactly what happened.

D. Stoe Dep. 107:1–108:5. Plaintiff's theory make no sense because had Tillery not intervened on Plaintiff's behalf at this point she would not have received an interview based on the score that Swineford gave her during the initial screening process. Here again, Plaintiff's theory is totally at odds with the undisputed record facts.

### 4.    The Interviews

Seven applicants, including Plaintiff, were invited for an interview. *Id.* ¶ 48. Because Plaintiff was selected for an interview, the ultimate selectee, Dr. Mark Greene, was also invited for an interview. *Id.* ¶ 47. Greene's written application did not qualify him for an interview, as per Gillerman's initial screening. *Id.* ¶¶ 43, 47. Greene obtained an interview pursuant to an OJP Policy that if one OJP employee on a certificate is interviewed (i.e., Plaintiff), then all OJP employees on that same certificate (i.e., Greene and Heaps) must also be interviewed. *Id.* ¶ 47.[8]

---

[7] This assertion is also plainly incorrect and contradicted by the record. Far from deeming him unqualified, Gillerman gave Greene the very same interview score as Plaintiff (he had them tied for first). Plaintiff later stated that she did not believe that Gillerman had discriminated against her. Thus, even the one member of the panel to whom Plaintiff does not attribute an unlawful motive found her and Greene to be equally qualified.

[8] Plaintiff is not alleging that the OJP Policy had a discriminatory impact. *See* Stoe Dep. at 140:17–18 ("I have no comment on that one way or the other. I don't – I don't see it as discriminatory.").

The interviews were conducted over two separate days in July 2014.  *Id.* ¶ 49.  The five interview questions, which focused on the five KSAs, were prepared by Tillery and vetted through human resources.  *Id.* ¶ 50.  Every candidate was asked the same series of questions during the interview.  *Id.* ¶ 49.

### 5.    *The Selection Decision*

Tillery shared his interview scores for the candidates with his fellow panelists in an email on July 18, 2014.  *Id.* ¶¶ 52–53.  In that same email Tillery proposed, and the panelists agreed, that Tillery would ultimately select the candidate with the highest average score overall from the interviews (i.e., add together the three panelists' total scores for each candidate, and divide by three).  *Id.* ¶ 52.

 Swineford and Gillerman circulated their respective scores for the candidates a few days later, on July 21.  *Id.* ¶ 54–57.  The scores circulated revealed that there was a consensus among the panelists that three top candidates emerged from the interviews:  Dr. Mark Greene (male, age 38); Ms. Kathleen Higgins (female, age 66); and Plaintiff (female, age 60).  *Id.* ¶¶ 23, 33, 52–60.  There was a subsequent teleconference call that same day to discuss their scores.  *Id.* ¶ 60.

The following table summarizes the final scores that the panelists assigned to the consensus top three candidates.  *Id.* ¶ 59.  Greene received the highest average score (21.33), Plaintiff had the second-highest average score (19.00), and Higgins had the third-highest average score (18.67).  Tillery selected Greene because he received the highest combined average score from the interview panel.  *Id.* ¶ 60.

| Combined Scores for the Three Top Candidates | | | | |
|---|---|---|---|---|
| | Tillery | Swineford | Gillerman | Final Score (Avg.) |
| **Greene, Mark** | 21 | 23 | 20 | **21.33** |
| **Higgins, Kathleen** | 21 | 18 | 17 | **18.67** |
| **Stoe, Debra** | 18 | 19 | 20 | **19.00** |

In summary, two of the three panelists – Tillery and Swineford – concluded, based on Greene's and Plaintiff's performances during their interviews and the strength of their answers, that Greene fared better than Plaintiff during the interview. *Id.* ¶¶ 64–68 (Tillery's explanation for his scoring), ¶¶ 77–82 (Swineford's explanation). The third panelist (Gillerman) thought that, while they each had different strengths, they performed comparably overall during the interview and that they were equally qualified for the position. *Id.* ¶¶ 69–76. As Tillery later explained in a Memorandum for the Record that documented the selection process, the "major differentiators in [Greene's] favor were his detailed understanding of the OJP grants processes and their issues and his ability to provide guidance on technology policy." *Id.* ¶ 61. The panelists' justifications for the selection decision are discussed in further detail in the next section. *See also id.* ¶¶ 61–82.

## Legal Standards

### A.    Motions for Summary Judgment

Summary judgment is appropriate when the pleadings and evidence show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015). A "material fact" is one whose existence affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine

dispute" exists when the non-movant produces sufficient evidence of a material fact so that a fact finder is required to resolve the parties' differing versions at trial. *Id.* at 249.

Once a party moves for judgment as a matter of law, the opposing party must set forth specific facts showing that there is a "genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 575 (1986) (citing Rule 56(e)). To prevail on a motion for summary judgment, therefore, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. A moving party may succeed on summary judgment by pointing to the absence of evidence proffered by the nonmoving party. *Id.*

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position, *id.* at 252, and cannot rely on "mere allegations" or conclusory statements. *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011); *see also Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (stating that court should not adopt a party's version of the facts if it is blatantly contradicted by the record). Rather, the plaintiff must elucidate "specific facts" showing a factual dispute. *Matsushita Elec.*, 475 U.S. at 587 (internal quotation mark omitted).

If the disputed evidence "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50. Likewise, "conclusory allegations and unsubstantiated speculation do not create genuine issues of material fact." *Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 195 (D.D.C. 2008) (internal quotations and citation omitted); *see*

*also Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) ("Accepting such conclusory allegations as true . . . would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial.").

    **B.**    **The *McDonnell Douglas* and *Brady* Framework for Discrimination Claims Under Title VII and the ADEA**

        Title VII bars a federal agency from discriminating against any employee based on her sex. 42 U.S.C. § 2000e-16(a). The ADEA similarly protects federal employees over forty years old from discrimination based on their age. 29 U.S.C. § 633a(a). The Court analyzes both Title VII and ADEA claims under the well-established burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

        Under this framework, the plaintiff first has the burden of proving a *prima facie* case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. Second, if the plaintiff succeeds in proving a *prima facie* case, then the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its action. *Id.* at 802–03. Third, if the employer meets its burden of production, then the plaintiff must prove that the employer's stated reason is a pretext for discrimination. *Id.* at 804. Although *McDonnell Douglas* shifts the burden of production between the parties, the plaintiff retains the burden of persuasion. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993).

        In *Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008), the D.C. Circuit streamlined the *McDonnell Douglas* framework for resolving a motion for summary judgment in disparate treatment cases under Title VII. When the defendant provides a legitimate, non-discriminatory explanation for its action at the summary judgment stage, "the district court need not—and should not—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*. *Id.* at 494. Rather, the Court should focus on one central question: "Has

13

the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee?"  *Id.* at 494.[9]  "The plaintiff cannot rely on her view that the employer's actions were imprudent or unfair; an employer may make an employment decision for a good reason, a bad reason, or no reason at all so long as discriminatory . . . animus does not influence the decision."  *Glass v. Lahood*, 786 F. Supp. 2d 189, 213 (D.D.C. 2011) (internal quotation marks and alterations omitted).

## Argument

## I.   Defendant Proffers a Legitimate Reason for the Non-Selection

"In asserting a legitimate, non-discriminatory justification for the challenged actions, the defendant 'need not persuade the court that it was actually motivated by the proffered reasons.'" *Kilby-Robb v. Devos*, 247 F. Supp. 3d 115, 122 (D.D.C. 2017) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  Here, Defendant asserts that it made its selection decision based purely on the relative qualifications of the candidates, and it has properly supported that representation with competent evidence in the record.

After receiving the lists of pre-screened candidates from Human Resources, the selection decision proceeded mainly in two steps.  First, the panelists decided which of the candidates would be interviewed based on their written submissions.  Def.'s SMF ¶¶ 38, 42–44.  The ultimate selection decision was based not on the written submissions, however, but on the strength of the candidates' answers during the interviews.  *Id.* ¶ 60.  The calculation that determined the outcome of the selection was straightforward.  *Id.* ¶ 52.  There were five

---

[9] Plaintiff has not adduced any "direct evidence" of discrimination.  *See generally Manuel v. Potter*, 685 F. Supp. 2d 46, 60 n. 11 (D.D.C. 2010) ("'[D]irect evidence' is that which, if believed by the fact-finder, establishes the fact in question without any need for an inference, including statements or documents showing a discriminatory . . . animus on their face.").

interview questions that related to the five Knowledge, Skills, and Abilities that were required for the Supervisory Program Manager position. *Id.* ¶ 50. Each of the interview questions was weighted equally, and scores were awarded on a scale of "1" to "5", with "1" being the lowest possible score and "5" the highest possible score. *Id.* ¶ 50. The scores from the five separate interview questions would be added together for an overall score (with 25 being the highest possible score). *Id.* ¶ 52. There being three members of the panel, the panelists would add together their final scores, and divide by three, to come up with an average overall score. Whichever candidate had the highest average overall score would be selected.

As it turned out, Dr. Mark Greene (male, age 38) had the highest overall average score; therefore, he was selected for the position. *Id.* ¶ 60. Each of the three members of the panel – Chris Tillery (male, age 59); Maria Swineford (female, age 36); and Gordon Gillerman (male, age 49) – testified at deposition and provided sworn declarations that explained their scoring of the candidates and their assessments of the relative qualifications of Plaintiff, Greene, and Higgins. *Id.* ¶¶ 61–84. While the panelists' precise scoring differed, they all agreed that Plaintiff was strong in the area of standards development and conformity assessment, which was the focus of her current position. *Id.* ¶¶ 66, 74, 83. But they also thought that Greene's answers demonstrated a nuanced appreciation of standards. *Id.* ¶¶ 65, 71, 83. What differentiated the two candidates the most was that Greene's responses during the interview demonstrated a greater understanding of the other requirements of the position relating to technology policy, business processes and grants management, interactions with stakeholders, and the ability to supervise. *Id.* ¶¶ 61–63. In short, Plaintiff's answers were too narrowly focused on certain technical aspects of the position, which covered only some of the qualifications of the job as reflected in the KSAs. *Id.* ¶¶ 66, 73. Whereas Greene's answers demonstrated that he had a better

understanding of *all* of the unique requirements of the position. *Id.* ¶¶ 65, 70.   Accordingly,

Defendant has asserted a legitimate, non-discriminatory justification for the selection decision.

## II.     Plaintiff Has Adduced Insufficient Evidence for a Reasonable Jury to Conclude That Defendant's Reason for the Non-Selection Is Pretextual

Because Defendant has advanced a legitimate reason for its decision – that it selected a

better-qualified candidate for the position – the Court may proceed directly to the ultimate

question of whether Plaintiff has adduced sufficient evidence for a reasonable jury to conclude

that Defendant's proffered reason is pretextual and that its real motivation was discrimination

based on Plaintiff's sex and age.   The Court should conclude that she has not.

### A.     A Reasonable Jury Would Not Conclude That Plaintiff Was Significantly Better Qualified Than the Selectee

In a non-selection case, if the evidence shows that a reasonable employer would have

found the plaintiff to be "significantly better" qualified for the job than the selectee, but the

defendant did not, the jury may legitimately infer that the defendant consciously selected a less-

qualified candidate. *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 25

(D.C. Cir. 2013); *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008).  That

is "something that employers do not usually do unless some other strong consideration, such as

discrimination, enters into the picture." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir.

1998); *see also Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006).

To prevail on a relative qualifications claim, however, the plaintiff must make a showing

that there is a "qualification gap . . . great enough to be inherently indicative of discrimination."

*Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007); *see also Porter v. Shah*, 606 F.3d 809,

816 (D.C. Cir. 2010) (referring to a "stark superiority of credentials").   If the plaintiff's

qualifications are "close" to those of the selected candidates, the D.C. Circuit has directed courts

to defer to the employers' selection decisions. *Adeyemi*, 525 F.3d at 1227 (citing *Aka*, 156 F.3d

at 1294); *see also Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Short of finding that the employer's stated reason was indeed a pretext . . . the court must respect the employer's unfettered decision to choose among qualified candidates"). "An employer may of course select a candidate who on paper is less qualified for other reasons, such as subjective reactions that emerge in the interview." *Aka*, 156 F.3d at 1294; *see also Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982) (cautioning district courts not "to second-guess an employer's personnel decision[s] absent demonstrably discriminatory motive").

Plaintiff contends that she was discriminated against on the basis of her sex and age when Tillery selected Greene instead of her to fill the vacancy for the Supervisory Program Manager position. Here, though, the undisputed record facts establish that Greene was the highest-rated candidate and that he was fully qualified to perform the position at the time of his selection. *See Glass*, 786 F. Supp. 2d at 213 (finding that gap in qualifications between the plaintiff, a female, and the selectee, a male, was not of such magnitude as to be "inherently indicative" of sex discrimination under Title VII).

The Supervisory Program Manager position had three main substantive areas of responsibility: conformity assessment standards and testing; grants and business process management; and technology policy. Def.'s SMF ¶ 21. Throughout his employment with OS&T, and his prior employment, Greene garnered relevant experience in these areas. *Id.* ¶¶ 85–87. Prior to coming to NIJ, Greene had obtained a Ph.D. in materials science and engineering from Northwestern University, an advanced degree that other candidates, including Plaintiff, lacked. *Id.* ¶ 87. He had also completed a postdoctoral fellowship at NIST. *Id.* ¶ 87. Dr. Greene had extensive experience working on technology performance and equipment performance standards throughout his career. *Id.* ¶¶ 85–87. As Plaintiff's former supervisor,

17

Dave Hart, who was uninvolved in the selection process but familiar with Greene's work, put it, Greene was "eminently qualified for that position." Hart Dep. at 143:8–144:11 (Ex. 6).

Plaintiff has no evidence that would permit a reasonable jury to conclude that she was markedly or significantly more qualified than Greene.  Plaintiff's argument rests on her stated belief that the Supervisory Program Manager position should have been hers because, as her supervisors agreed, she was already performing GS-15 level work, whereas Greene, she believed, had not.  *See, e.g.*, Pl.'s Resp. to Interrog. No. 1 at pp. 2–4, No. 2 at p. 7, No. 4 at p. 8, No. 5 at 20 (Ex. 3).  Thus, although she never held the position (it was previously held by Plaintiff's first-line supervisor, Dave Hart), she still viewed herself as the incumbent.  But Plaintiff failed to recognize that the position to which she was applying was not the same position as the role she had filled as a GS-14.  *See* Def.'s SMF ¶ 17.  The new position to which Plaintiff was applying was a supervisory position, whereas Plaintiff had not supervised anyone in her current position, including with respect to the GS-15 level work that she had previously performed.  *See* Stoe Dep. at 44:18–45:7.  It was precisely because her role was non-supervisory that the NIJ Acting Director denied the request for a desk audit.  Def.'s SMF ¶¶ 11, 15.

In addition, the new position consolidated the responsibility for OS&T's policy work, and the position was responsible for OS&T's business process, which principally involved grants management.  *Id.* ¶ 17.  In short, while Plaintiff viewed herself as the leading candidate in the areas of standards, testing, and conformity assessment,[10] this was only one of the three main areas of responsibility for the new position.  And even in this first area of responsibility, which

---

[10] *See, e.g.*, Stoe Decl., Ex. 2 at 3–6 (summarizing the duties that Plaintiff contended were GS-level work; the discussion is focused primarily, if not exclusively, on standards, testing, and conformity assessment), *id.* at 11 (asserting that she believed that the new position was, in essence, the "the GS-15 promotion position I had been waiting for, with the addition of 'formal' supervision"), *id.* at 11–14 (summarizing the qualifications that Plaintiff believed she possessed that made her an outstanding candidate for the position; again, the discussion is narrowly focused on standards, testing, and conformity assessment).

Plaintiff considered her strength, a majority of the panelists found Greene to be equally qualified based on the interview question that specifically addressed conformity assessment activities. *Id.* ¶¶ 65, 77, 83.  And Gillerman, who Plaintiff identified as a reference and who is considered an expert in conformity assessment (Gillerman Dep. 23:17-20, 24:13-18), scored Greene's interview response about this first area of responsibility as a "4," only one point below the score that he provided to Plaintiff. *Id.* ¶¶ 69, 71.

In the other two main substantive areas of responsibility – grants and business process management and technology policy – Greene scored equally or better on the interview than Plaintiff did. *Id.* ¶ 61.  And justifiably so.  The expert on the panel concerning grants and business process management was Maria Swineford. *Id.* ¶¶ 26.  Swineford served as the Deputy Director of Grants Management at OJP. *Id.*  In response to the question relating to business processes and grants management, Plaintiff's answers betrayed, in Swineford's opinion, a lack of expertise and familiarity with the agency's current business processes and grants management systems. *Id.* ¶ 78.  Greene, by contrast, provided a more detailed response highlighting relevant experience involving numerous parts in the lifecycle of a grant. *Id.* ¶ 79.  Gillerman and Tillery also rated Greene equally or better than Plaintiff in this area. *Id.* ¶¶ 66, 71.  Tillery testified that Plaintiff's response to the business process question demonstrated a situation where she was a problem solver "but did not illuminate some degree of experience with the grants process arena." *Id.* ¶¶ 66–67.  Likewise, in explaining why he gave Greene the top score of "5" on this particular question, Gillerman testified that he remembered that Greene gave a "very comprehensive" response that showed "a lot experience" with business processes and grants management. *Id.* ¶ 72.

Greene also outperformed Plaintiff in his responses to the questions in the areas of technology policy and, relatedly, the need to interact with various stakeholders in the law enforcement community.  *Id.* ¶¶ 64–66, 72, 75, 83.  Each of the panelists recalled a specific example that Greene had provided during the interview, in which he had moderated a discussion on smart gun technology with the U.S. Attorney General, smart gun technology vendors, and traditional firearms manufacturers.  *Id.* ¶¶ 65, 72, 82.  Plaintiff's answer was not as memorable. Additionally, Gillerman and Tillery found that Plaintiff and Greene demonstrated an equal ability to supervise others, while Swineford gave Greene a one-point edge on that question.  *Id.* ¶¶ 64, 69, 80.  Based on this record, therefore, there is no basis for a fact-finder to conclude that the gap in qualifications between Plaintiff and Greene was of such a magnitude as to be "inherently indicative" of discrimination.  *See Glass*, 786 F. Supp. 2d at 214.

### B.      The Undisputed Record Evidence Further Undercuts Any Inference of Discrimination

While the first conclusion alone suffices to grant summary judgment in Defendant's favor, other undisputed facts in the record even further undercut any possible discriminatory inference that might be drawn.

As an initial matter, Plaintiff's discrimination claim is directed primarily, if not exclusively, at the selecting official, Chris Tillery.  The following testimony illustrates Plaintiff's firm and unwavering, yet utterly speculative, belief that Tillery had discriminated against her at some unknown point during the selection process:

> So, when I asked him [Tillery] -- I said what did you score me, Chris, and he said I can't tell you that, I knew from that moment that he had discriminated against me.  I don't know how.  I don't know what he did, but I knew he had discriminated against me, and I was pretty certain at that point that it was probably Mark Greene that had gotten it, and the reason was because Mark was male, 38, and I was 60 years old and I was a female, and there no way that Chris was going to give me a job with -- as supervision over other men.  He just wasn't going to do it, and I knew it right then.

Stoe Dep. at 145:17–146:2 (Ex. 1).

As to the other two members of the panel, at one point in her deposition Plaintiff stated that she thought that Maria Swineford had also discriminated against her. *Id.* at 107:1–4. But then when asked to expound on that theory, her answer quickly pivoted back to Tillery. *Id.* Plaintiff later clarified that she was bringing a discrimination claim against Tillery only and that she "was not filing any kind of discrimination against Maria [Swineford] or Gordon [Gillerman]." *Id.* at 159:12–14; 110:6–8 ("Q. Are you alleging that Mr. Gillerman discriminated against you?  A. No."); 174:13–15 ("I did not file this case against Maria.  I filed the case against Chris.").  If Plaintiff attempts to argue in opposition to Defendant's summary judgment motion that Swineford and/or Gillerman's scores were discriminatory, that is not consistent with the claims that Plaintiff made during discovery and, in any event, Plaintiff adduced no evidence in support of those claims.

### 1.    Plaintiff's Claims Are Improbable, Conclusory, and Speculative

In many respects, Plaintiff's claims of discrimination and pretext are improbable, conclusory, and entirely speculative. *See Rosaura Bldg. Corp. v. Municipality of Mayaguez*, 778 F.3d 55, 61 (1st Cir. 2015) (an appropriately supported summary judgment cannot be defeated by inferences that are unreasonable or improbable, allegations that are conclusory, or mere speculation); *Moore v. Pritzker*, 204 F. Supp. 3d 82, 95 (D.D.C. 2016) (although the court must consider all allegations in the light most favorable to the non-moving party, mere speculation is insufficient to establish pretext).  Moreover, the various factual scenarios that Plaintiff posits are illogical and plainly contradicted by the summary judgment record.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Plaintiff claims that Tillery asked Swineford to increase Plaintiff's score during the initial assessment because he secretly wanted to get Mark Greene and Joe Heaps before the interview

21

panel and it was the only way he could accomplish that.  D. Stoe Dep. 107:1–108:5.  Not only is this pure speculation (*id.* at 108:19–110:2), the claim makes no sense because if Tillery had not intervened on Plaintiff's behalf and asked Swineford to revise Plaintiff's score, she would not have qualified for an interview.

Plaintiff would also ask the jury to infer discriminatory intent from the fact that, even before the panelists screened the applications, Tillery asked Human Resources to expand the pool of eligible candidates.  Stoe Dep. 95:19–96:2, 96:8–96:24.  Yet it is beyond dispute that Plaintiff would not have received an interview if Tillery had not made the request to expand the pool of applicants.  *See* Def.'s SMF ¶¶ 27–36.  Plaintiff was not on any of the active certificate lists.  *Id.*  Plaintiff's argument that Tillery had an ulterior motive in making that request, and that his request only benefited her male counterparts (namely, Greene and Heaps), and that this disadvantaged her in some way, is so implausible, and so contrary to the record, that it cannot possibly create a discriminatory inference.  Plaintiff also evidently blamed Tillery for the fact that multiple certificate lists were generated, but the uncontroverted record evidence established that Tillery was uninvolved in the generation of the certificate lists prior to sending the email to Human Resources on May 21, 2014.  *Id.* ¶ 30.

The record abounds with instances such as these in which Plaintiff made implausible and speculative claims that are contradicted by the record.  Plaintiff stated that "there was no way that Gordon was going to say that Mark [Greene] . . . was qualified to do this job."  Stoe Dep. at 107:15–21.  Not only did Gillerman find Greene to be qualified, he had Greene tied with Plaintiff as his top choice for the position.  Def.'s SMF ¶ 59.  As another prime example, Plaintiff stated in her responses to the interrogatories that Gillerman "*likely* has knowledge of Mr. Tillery's discriminatory bias toward and preselection of Mark Greene."  Pl.'s Resp. to Interrog. No. 9 at p.

30 (Ex. 3) (emphasis added).  Plaintiff admitted in her deposition, however, that she did not know this to be true and that she was purely speculating when she stated this.  *See* Stoe Dep. at 182:15–19 (Ex. 1).  For his part, Gillerman said that it was simply not true.  Gillerman Dep. at 268:21–270:5 (Ex. 28).  These and the other inferences that Plaintiff would have the Court draw are not reasonable and cannot defeat summary judgment.

### 2. *The Selecting Official Favored a Candidate of the Same Protected Class as Plaintiff*

Additionally, Plaintiff had the (false) impression that Tillery favored Greene throughout the selection process.  Plaintiff formed this belief, at least in part, because she received a redacted copy of the May 21, 2014, email that Tillery sent to Human Resources.  Def.'s SMF ¶ 34; *see also* Factual Background at 5–6, *supra*.  Plaintiff thought that the "ideal candidate" Tillery was referring to in that email was Greene, when in fact he was referring to another candidate, Kathleen Higgins.  *Id.*  Higgins shares the same protected characteristics as Plaintiff (indeed, she is actually several years older than Plaintiff).  Even after being shown the un-redacted email during deposition in which Tillery specifically asked "*Can I get Ms. Higgins in front of the panel for consideration?*" Plaintiff *still* refused to admit that Plaintiff was trying to get Higgins on the certification list.  Stoe Dep. at 135:1–3.

The record further establishes that in the final analysis Tillery continued to view Higgins as an ideal candidate, scoring her equally to Greene.  Stoe Dep. at 180:6–12 (acknowledging that Tillery gave Higgins and Greene the same scores—"21").  Tillery had them tied as his top two candidates, and he testified that he would have been happy selecting either candidate.  Def.'s SMF ¶ 67.  Greene was selected not because of Tillery's individual scores, but because the average weighted score of the three panelists put Greene over the top.  *Id.* ¶¶ 59–60.  Plaintiff also cannot dispute that Tillery suggested this selection mechanism *before* he had received the

final interview scores from the other two panelists, which means he did not yet know how Swineford and Gillerman would score the candidates.  *Id.* ¶¶ 52, 54, 56.

And thus, although Higgins was not the selectee, the fact that Tillery gave her the same score as Greene "seriously undermines" Plaintiff's claim that Tillery's decision not to select Plaintiff was discriminatory.  *See Bell v. Donley*, 928 F. Supp. 2d 174, 184 (D.D.C. 2013).  In an analogous case in this jurisdiction, for example, an African American employee brought an action against the Navy alleging race discrimination in promotions and retaliation.  *See Walker v. Dalton*, 94 F. Supp. 2d 8, 16 (D.D.C. 2000).  One of the three best-qualified candidates rated higher than the plaintiff by the selecting official and by the panel was an African–American male.  One of the three panel members who ranked the applicants was also an African–American male.  In finding that the record lacked evidence upon which a reasonable jury could base a finding of discrimination, the *Walker* court reasoned that "these facts negate any weak inference of pretext that a jury might draw from . . . [a] comparative evaluation of plaintiff's and the selectee's qualifications."  *Id.* at 16.

A number of other courts in this jurisdiction have reached similar conclusions in non-selection cases in which a selectee or replacement shared some or all of the plaintiff's protected characteristics.  *See Murray v. Gilmore*, 406 F.3d 708, 715 (D.C. Cir. 2005) (citing *Brown v. Brody*, 199 F.3d 446, 451 (D.C. Cir. 1999)) (affirming the dismissal of a race discrimination claim because even assuming the defendant's justifications were pretext; "a replacement within the same protected class cuts strongly against any inference of discrimination"); *Montgomery v. Gotbaum*, 920 F. Supp. 2d 73, 84 (D.D.C. 2013) (stating that the plaintiff's race discrimination was "particularly undercut" by the fact that the selectee was also African American); *Glass*, 786 F. Supp. 2d at 216 ("[T]he fact that the ultimate selectee and the relevant decision-maker shared

pertinent characteristics with [plaintiff] further undermines any inference of discrimination."); *Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298, 314 (D.D.C. 2005) ("[T]he fact that the selectee was a [sic] African–American female, while not dispositive, cuts against plaintiff's claims of discrimination based on sex and race.").

### 3.      Two Members of the Panel Share Protected Characteristics with Plaintiff

As if that were not enough, any discriminatory inference is even further weakened by the fact that one member of the panel – Chris Tillery – is approximately the same age as Plaintiff (he is only one year younger than she) and another member of the panel – Maria Swineford – the same sex.  *See Aka*, 156 F.3d at 1291 (suggesting that the inference of discrimination is undercut where the hiring officer is a member of the same protected class as the plaintiff); *Ranowsky v. Nat'l R.R. Passenger Corp.*, 244 F. Supp. 3d 138, 144 (D.D.C. 2017) ("[A]ny inference of discrimination is undercut by the fact that [the plaintiff] was fired by [a decision maker] who is the *same age* as [plaintiff].") (emphasis in the original); *Glass*, 786 F. Supp. 2d at 216 ("[T]o the extent her claim is rooted in sex, the fact that [recommending official] is within the same protected class, if anything, also weighs against an inference of discrimination."); *Washington v. Chao*, 577 F. Supp. 2d 27, 42 (D.D.C. 2008) (while not dispositive, fact that selecting official and plaintiff are members of the same protected class is also a fact that weighs against any inference of discrimination); *Hammond v. Chao*, 383 F. Supp. 2d 47 (D.D.C. 2005) (same); *Walker*, 94 F. Supp. 2d at 16 (finding no inference of pretext where one of the three panel members who ranked the applicants was of the same protected class as plaintiff); *Horvath v. Thompson*, 329 F. Supp. 2d 1, 5 (D.D.C. 2004) (harder to establish sex discrimination when selecting official same sex as plaintiff).

Indeed, when pressed on this particular point as it related to Swineford's scores, Plaintiff would say only that she "disagreed" with Swineford's scores.  She could not say whether they were discriminatory.  Stoe Dep. at 174:1–15.  Plaintiff later speculated that perhaps Tillery might have influenced Swineford's scoring in some way, but there is no support in the record for that claim.  *Id.* at 193:8–194:10.  And while Plaintiff would like to give the misimpression that it was Tillery's scoring that was the decisive factor (*see, e.g.*, *id.* at 156:9–12), it was actually Swineford whose scores had the biggest influence on the selection decision.[11]  Def.'s SMF ¶ 59.

### 4. *An Unchallenged Member of the Panel Found Plaintiff and the Selectee To Be Equally Qualified*

And last, but not least, is the unavoidable fact that Gordon Gillerman, the third member of the selection panel to whom Plaintiff does not attribute any discriminatory animus, rated Plaintiff and Greene equally.  *Id.*  When confronted with that fact, Plaintiff could not explain why, in the absence of discrimination, Gillerman had still given her and Greene the same scores:

> Q.     And you're saying that Mr. Greene was not one of the candidates that Mr. Gillerman recommended[?]
>
> A.     Correct.
>
> Q     And tell me again, what's the significance of that?
>
> A.     It says here that I think he likely has knowledge of Mr. Tillery's discrimination towards me and pre-selection of Mark Greene, because Mr. Gillerman did not think that Mark Greene was qualified to even make an interview, and yet, Mr. Greene was the one that was selected for the position. So, there is some contradiction in that.
>
> Q.     Well, Mr. Gillerman himself scored Dr. Greene the same as -- as you in the interview, right?
>
> A.     Correct.

---

[11] Swineford scored Greene four points higher than Plaintiff, Tillery scored Greene three points higher than Plaintiff, and Gillerman scored them equally.

Q.   Does that not suggest to you that Mr. Gillerman found that he was qualified for the position?  [counsel's objection omitted]

A.   I don't believe that to be true.  I don't think that he -- I don't know what Gordon was thinking when he gave him those scores.

Stoe Dep. at 184:12–20.  That a sympathetic, unbiased, and *unchallenged* member of the panel found Greene to be equally qualified as Plaintiff fully eliminates any remaining strands of an inference that the other two panelists' assessments of the comparative qualifications of the candidates resulted from discriminatory animus and that the explanations they provided for the selection decision were pretextual.

## Conclusion

WHEREFORE, for the foregoing reasons, Defendant respectfully requests that the Court grant summary judgment for Defendant.


October 27, 2017                              Respectfully submitted,

                                             JESSIE K. LIU
                                             D.C. Bar 472845
                                             United States Attorney

                                             DANIEL F. VAN HORN
                                             D.C. Bar 924092
                                             Chief, Civil Division

                              By:     */s/ Daniel P. Schaefer*
                                             DANIEL P. SCHAEFER
                                             D.C. Bar 996871
                                             Assistant United States Attorney
                                             555 4th Street, N.W.
                                             Washington, D.C. 20530
                                             (202) 252-2531
                                             Daniel.Schaefer@usdoj.gov


                                      27