EXHIBIT 1

Page 1

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - - - - - x
                                   :
DEBRA STOE,                        :
                                   :
            Plaintiff,             :
                                   :
      v.                           :  Civil Action No.
                                   :  16-1618(JDB)
JEFF SESSIONS, ATTORNEY GENERAL,   :
U.S. DEPARTMENT OF JUSTICE,        :
                                   :
            Defendant.             :
                                   :
- - - - - - - - - - - - - - - - - x
```

Washington, D.C.

Monday, June 19, 2017

Deposition of:

DEBRA STOE

a witness of lawful age, taken on behalf of the Defendant in

the above-entitled action, before Jennifer M. O'Connor,

Notary Public in and for the District of Columbia, in the

offices of the AUSA, 501 3rd Street, N.W., 4th Floor,

commencing at 10:07 a.m.

Diversified Reporting Services, Inc.

(202) 467-9200

1   you experienced this in your first deposition, there may be

2   times where your counsel has an objection to a question, and

3   just for the sake of the record, it's best to let your

4   counsel get the objection on the record, and unless your

5   counsel instructs you not to answer, I will still require an

6   answer from you.

7           So, the -- the lawyers are making objections to the

8   form of the question, and that's for the court's benefit, but

9   if your -- if your lawyers object, you're still expected to -

10  - to give an answer to the question.  Do you understand that?

11      A    Yes, I do.

12      Q    Okay.  And are you taking any medication or drugs

13  today that might impair your ability to answer questions

14  truthfully?

15      A    No.

16      Q    And are you at all sick today?

17      A    No, I'm not.

18      Q    Okay.  And are you under the care of a physician

19  for any illness currently?

20      A    No.

21      Q    Is there any reason why you cannot give full,

22  complete, and accurate testimony today?

23      A    No.

24      Q    Okay.  All right.  Well, then we can get started.

25          So, Ms. Stoe, where are you employed currently?

Page 9

1      A      I am employed with the Department of Justice,

2   Office of Justice Programs, National Institute of Justice,

3   Office of Science and Technology.

4      Q      All right.  And let's try to break those down.

5      A      That was starting from the top to the bottom.  Do

6   you want me to go from the bottom to the top?

7      Q      We can go from the top to the bottom.  All right.

8   So, this is under the -- the Department of Justice, yes?

9      A      Yes.

10     Q      And working from the top on down, what was the

11  second sub-agency that you mentioned?

12     A      The Office of Justice Programs.

13     Q      And what does the Office of Justice Programs do?

14     A      They are looked at generally as really the grant-

15  making, money-moving piece of the Department of Justice.  A

16  lot of the -- so, OJP has four or five agencies.  I forget --

17  they change.

18            So, they have OJJDP, Office of Justice, juvenile

19  delinquency.  They have the Bureau of Justice Statistics,

20  BJS; BJA, the Bureau of Justice Assistance; and the Office of

21  Victims of Crime, and then NIJ.

22            NIJ is the Office of Science and Evaluation and

23  Technology Development for the Department of Justice.

24     Q      Okay.  So, NIJ stands for --

25     A      -- the National Institute of Justice.

1     Q     -- National Institute of Justice.

2     A     Uh-huh.

3     Q     Okay.  And then, under the National Institute of

4  Justice, what was the third --

5     A     So, under --

6     Q     -- group that you referenced?

7     A     NIJ has three major departments, the Office of --

8  ORE, Office of Research Evaluation; OST, the Office of

9  Science and Technology; and OFIS, the Office of Forensic

10  Investigation Science.

11     Q     Okay.  And you're under the OST organization?

12     A     Correct.

13     Q     Office of Science and Technology?

14     A     Correct.

15     Q     Okay.  How large of an organization is the Office

16  of Science and Technology?

17     A     There's approximately 15 of us.

18     Q     And who is the director of OST?

19     A     Chris Tillery.  George Tillery, but he's referred

20  to as Chris.

21     Q     Okay.  And how long has Mr. Tillery been the

22  director of the Office of Science and Technology?

23     A     So, I started with OS&T in 2004, and this is a

24  little bit of a tricky question, because at that time, John

25  Morgan was the director, and Chris Tillery was his, I would

1              So, did you hold the same position, the same

2    technical or official position at the GS-14 level from 2004,

3    when you joined OST, through -- through the period we're

4    talking about here, when you -- when you sought promotion to

5    the new GS-15 position?  Were you in the same position that

6    whole period of time?

7         A    I would ask you to explain what you mean by

8    "position," and I can add to that, because I started as a --

9    I came in as a GS-14 program manager, and around 2008 or '10,

10   it was changed to physical scientist.  They redid our

11   position description, but I was still a GS-14.

12        Q    Okay.

13             So, tell me again, when you came in, what was the

14   first position called?

15        A    I want to say it was a program manager.  It was a

16   long time ago, so --

17        Q    Program manager --

18        A    Right, GS-14.

19        Q    GS-14.  And then that changed to --

20        A    -- physical scientist.

21        Q    -- physical scientist, and that was also a GS-14.

22        A    Right.

23        Q    And you held the position of physical scientist at

24   the time that you applied for the supervisory program manager

25   position?

1  Is that right?

2       A     Not quite.

3       Q     Okay.  Well, tell us about how that came about.

4       A     Well, the correction is, the first conversation I

5  had was with Chris Tillery.  It was in, actually, 2010, and

6  it was Chris and Dave, and that's the first time I brought it

7  up, around September, and then I brought it up again in 2011

8  with Dave and Chris, and asked them if any movement had been

9  made on that.

10       Q     And let's pause there for a moment.  So, you

11  mentioned Dave Hart before.  Where does Dave fit into the

12  organization?

13       A     Dave worked for Chris.  Dave Hart was my first-line

14  supervisor.

15       Q     And what was Dave's position?

16       A     Supervisor of the Office of Technology Division.

17       Q     And my understanding is that, at some point, Dave

18  Hart left OST, right?

19       A     Correct.

20       Q     And when did that happen?

21       A     2014.

22       Q     Do you recall when in 2014?

23       A     Approximately February, March, February-March.

24       Q     Okay.  So, we'll go back to 2010, when these

25  conversations started.

1   discussed in this initial meeting was a reorganization of the

2   business unit?

3       A    Correct.

4       Q    And did the three of you talk about any particulars

5   and how that would work?

6       A    I'm sorry?

7       Q    Did the three of you talk about any particulars in

8   terms of how the reorganization would work?

9       A    Chris said that what he might be able to do would

10  be to restructure the organization and he would save two of

11  his -- if he needed to, is the way he put it to me, which --

12  anyway, he would save two of the GS-12/13 positions, not fill

13  those positions, and use that funding to support the funding

14  necessary to create the GS-15 standards and policy position.

15      Q    And did you talk about who you would report -- who

16  you would have reported to if that reorganization had

17  occurred?

18      A    I would still be reporting to whoever the

19  supervisor of this division would be.  I mean, we would still

20  -- it would have been in the same OTD division, and I would

21  still be reporting to that supervisor, and Chris would still

22  be my second line supervisor.

23      Q    Okay.

24           So, that supervisor, at that time, would have been

25  Dave Hart.

Page 44

1      A      Yes.

2      Q      How many people would have been reporting to you at

3   the GS-15 position?

4      A      I'm not certain.  Three?  Four?  I don't know what

5   the organizational -- what my -- I would have to think

6   through what my elevation to that position would do to the

7   other slots, but I would say at least three or four.

8      Q      How many people report to Mark Green currently?

9      A      Three.

10     Q      Three.  Including you?

11     A      Including me.

12     Q      Were there any aspects or responsibilities of the -

13  - the posting for the GS-15 position that were

14  responsibilities that you did not have currently?

15     A      Actually developing -- developing the performance

16  reviews for employees -- that's the only thing that I can

17  think of.

18     Q      Were you supervising anybody at the GS-14 level at

19  that time?

20     A      I was -- at that time, I was managing -- over the

21  years, I had managed GS-15, 13, 14s, 12s.  So, it was well

22  within my abilities and experience.

23     Q      And did any of -- if you know, did any of the

24  responsibilities that Dave Hart had in his position get

25  incorporated into the -- the new GS-15 position for the

1  supervisory program manager?

2     A    It was supposed to be his job, but it was my job,

3  and the only thing that was incorporated that I can, you

4  know, put my finger on is just the supervisory piece of, you

5  know -- developing training programs for your employees and

6  the performance evaluations, the actual official supervisory

7  tasks.  Other than that, I was doing everything in that job.

8     Q    Okay.

9          I'll just state for the record that you were

10 shaking your head "no" in addition to the words you were

11 saying, so --

12    A    Okay.

13    Q    You're basically saying, in answer to my question,

14 no, correct?

15    A    No.  Except for what I stated, I was doing

16 everything that was in that GS position that fell outside of

17 those particular supervisory role.  I mean, as the

18 supervisory, he would attend supervisory meetings.  Okay.

19 So, I didn't do those things.

20    Q    Did Dave Hart's leaving the group create a new

21 vacancy, separate vacancy announcement?

22    A    It created a vacancy.

23    Q    Was that vacancy ever filled?

24    A    Yes.

25    Q    Who holds that position currently?

Page 52

1    of her position, which was submitted in 2012."  Let's start

2    with that.

3            Do you have any reason to disagree with the timing

4    of the request, 2012?

5        A    That's -- the way I read this, that's when he says

6    he submitted it.  I did not realize that that much time had

7    elapsed between the time we started and he actually submitted

8    it.  That's almost a year-and-a-half of working on the

9    document before he submitted it.

10       Q    So, you don't know when he submitted it?  Aside

11   from what he's saying, you don't have any personal knowledge

12   of when he submitted it?

13       A    I have to say I don't recall.  I didn't realize it

14   was that long.  I guess it just never -- never hit me.  I

15   just, you know -- I do remember --

16           MS. QUINN:  If you don't recall, don't speculate.

17           THE WITNESS:  Okay.  I don't recall.

18           MR. SCHAEFER:  Okay.

19           BY MR. SCHAEFER:

20       Q    And then that paragraph continues.  "If I remember

21   correctly, it took about six months, perhaps longer, to

22   develop that request.  The request was not approved."

23           Do you have any reason to doubt the accuracy of any

24   of that?

25           MS. QUINN:  Objection to the form.

1          THE WITNESS:  Right.  This doesn't make any sense

2   to me, you know, because it just seems too long.  What I

3   recorded earlier was that I felt like it was about six months

4   that we worked on the document, so --

5          BY MR. SCHAEFER:

6       Q    So, that part of it you don't object to, that it

7   took about six months to develop it?

8       A    Correct.

9       Q    Okay.  And then the next paragraph reads, "In early

10  2014, at Ms. Stoe's request, we revisited the matter with

11  then-NIJ Acting Director Greg Ridgeway."  Do you recall that

12  happening?

13      A    Yes.

14      Q    And just in terms of the timing, does that sound

15  about right to you, early 2014?

16      A    Yes.  Or actually 2013, but that was one of many

17  times, not the only time, and I'm sure that there's many

18  documents that reflect that.

19      Q    And then that paragraph continues, "We were

20  informed that, rather than conducting a desk audit and

21  increasing the grade of Ms. Stoe's PD, the duties that we

22  believed that she was performing that exceed the scope of the

23  PD should be transferred from her PD to that of her

24  supervisor."

25          Do you see that?

Page 54

1      A    Yes, I do.

2      Q    And was that explanation ever provided to you at

3  the time?

4      A    No.

5      Q    Do you have any reason to believe that the

6  explanation that Mr. Tillery is providing here is not

7  accurate?

8           MS. QUINN:  Objection to the form.

9           THE WITNESS:  I have -- I wasn't part of the

10  discussion.  I was not told that that was going to -- I just

11  didn't know.  I have no idea of knowing.

12           BY MR. SCHAEFER:

13      Q    And then Mr. Tillery says next, "At roughly the

14  same time, her supervisor departed OJP.  I assumed the

15  responsibility for supervising Ms. Stoe in the interim until

16  a vacancy announcement could be released and someone selected

17  to replace Mr. Hart."  Do you see that?

18      A    Yes.

19      Q    Do you recall that around this -- this time that

20  you reported directly to Mr. Tillery for a period?

21      A    Yes, I did.

22      Q    And that continued until Dr. Greene was selected as

23  the supervisory program manager, right?

24      A    Correct.

25      Q    Okay.

```
 1        Q    And -- and I'm just going to summarize here, but
 2   tell me if this is not accurate.  This appears to cover some
 3   of the things we've been talking about today, which was your
 4   frustration for the -- how long it took for this process to
 5   happen, right?
 6        A    Uh-huh.
 7        Q    And then about two-thirds of the way down, it says,
 8   "Eventually, he," being Mr. Tillery, "told me the desk audit
 9   would not happen."  Do you see that?
10        A    About where are you now?
11        Q    It's --
12        A    Are you like two-thirds down?
13        Q    Yes.
14        A    Yes, I see it.
15        Q    And then, it says, "When I asked why, I was told
16   'the building said no,'" and we talked about that, too,
17   right?
18        A    Uh-huh.
19        Q    And -- all right.  Now, here's the part I want to
20   ask you about.
21             It next says, "Mr. Tillery always blamed others
22   within the building for the delays, but I know for certain
23   that he delayed the initial introduction of the desk audit by
24   almost a year with endless unnecessary rewrites of the desk
25   audit request."  Do you see that?
```

1      A     Yes, I do.

2      Q     Okay.

3            What are you referring to when you say, "I know for

4      certain that he delayed the introduction of the desk audit"?

5      What do you mean by that?

6      A     With endless unnecessary rewrites of the desk audit

7      request.  This is the circular issue that I was talking

8      about.  I would make a -- I would send it to Dave.  Dave

9      would edit.  He would send it to Chris.  Chris would say,

10     okay, this is fine except for this needs to be changed.

11           He would send it back to me.  I would change it,

12     send it back, and then he would find something else to

13     change.

14           The he would send it back, tell me exactly what to

15     do.  I would do it, send it back, and he would find something

16     else.

17           So, it was an endless delay of editing that -- and

18     I believe there was an email to this effect.  I think we've

19     edited this to point where we're editing our edits and edits.

20     So, you know, we need to move this forward, because I was

21     getting frustrated.

22           So, that's exactly what I meant.  It was

23     unnecessary rewrites of the desk audit.  When it started --

24     it was good when it started.  You can only -- you know,

25     what's the word?  You know, just editing.

1     Q    And then next you say, "I found his efforts to be

2   superficial considering his ability to successfully execute

3   detailed strategies when it came to promoting my male

4   colleagues."

5          What are you referring to when you say "his ability

6   to successfully executed detailed strategies" for your male

7   colleagues?

8     A    So, when we initially discussed this, he said that

9   it was a two-pronged approach.  He was going to try to get me

10  a GS-15 via a reorganization of OS&T, and he was going to try

11  to do it via the desk audit.

12         So, he was doing both those things at the same

13  time, right?  I said this.

14    Q    Yes.

15    A    Part of the desk audit -- I mean, part of the reorg

16  was, without my knowledge, he promoted -- he changed two

17  position descriptions -- I'm sorry.  He would change one of

18  the position descriptions to an engineer, and he managed to -

19  - and I don't know how he managed to do this, but he managed

20  to promote GS-13s to two GS-14s, and they were both male, and

21  one was promoted from a physical scientist to an engineer,

22  and the other was promoted to an engineering position.  So, I

23  was -- you know, I was referring to that.

24         You couldn't manage to get the GS-15 that we had

25  been working on for the last year-and-a-half, but you were

Page 62

1    able to promote two of my male colleagues from -- and change

2    the position description to exactly what you wanted, what you

3    had planned, what you had strategized.

4            It seemed odd to me that he was able to, you know,

5    carry that out, but he wasn't able to -- to carry out what he

6    said he was going to do for me.

7        Q    And aside from the fact that he was successful in

8    those other cases and those -- those upgrades or promotions

9    happens and that, in your case, it did not, do you have any

10   other basis for your -- your belief that he was working

11   harder for them than for you?

12       A    Yes.

13           MS. QUINN:  Objection to the form.

14           THE WITNESS:  So, I don't know what that means, but

15   I will answer this question as in --

16           BY MR. SCHAEFER:

17       Q    When you say you don't know what that means --

18       A    I don't know --

19           MS. QUINN:  It's a compound.  I heard an "and" and

20   a -- can you just restate it?

21           MR. SCHAEFER:  Okay.

22           BY MR. SCHAEFER:

23       Q    I just want to make sure you weren't saying you

24   didn't understand my question.

25       A    Oh, okay.

```
 1        Q     Okay.

 2              Aside from the -- the fact that, in those other

 3   cases, Tillery was successful in -- in accomplishing what he

 4   was trying to do for your male colleagues --

 5        A     Uh-huh.

 6        Q     -- and that, in your case, he was not --

 7        A     Uh-huh.

 8        Q     Aside from that, is there any other basis for your

 9   belief that he was doing more for your male colleagues than

10   for you?

11        A     There is nothing aside from that.  That's exactly

12   what he was doing.

13              He was fighting for their positions.  He was

14   fighting for them to keep them, because they were male and

15   they -- in his opinion -- I don't know.  I'll back up.  I

16   can't read his mind, but I do know that they were males, and

17   for some reason, he was able to promote them.

18              But me, a female, an older female, because I was 22

19   years older than one and I don't know how much older than the

20   other but probably about the same, and I think that he went

21   to bat for them, and he walked in, like I said earlier, and

22   threw the paper down and said I need to keep these two guys,

23   and if I'm going to keep them, I need to get them promotions,

24   and by gosh, this is what we need to do, and he went to the

25   wall.
```

```
 1              When it came to me, I'm a female, I'm older, so he
 2    walks in and he says, you know what, she's doing GS-15 work
 3    and, you know, can we get her a promotion?
 4              So, there's two different ways that you can
 5    approach the situation.
 6              You can really push to get it done, and he managed
 7    to get it done for them, but he sure didn't manage to get it
 8    done for me, and I was doing twice as much high-level work
 9    than they were, you know, so it -- it was very frustrating.
10    Q    So, when you -- when you say he walked into the
11    office and he put down -- put down the memo for the male
12    colleagues, are you referring to something specific?
13    A    No.
14    Q    And when you -- when you say that he did not do
15    that for you, is that based on -- on -- do you have any --
16    any like personal knowledge that he did not do that for you?
17    A    Based on the outcome?
18    Q    Aside from the outcome.
19    A    But that's all I have to go on, is the fact that I
20    asked him for this GS-15 desk audit, which I was due, legally
21    due -- if I ask for a desk audit, you're supposed to give it
22    to me, and they dangled that in front of me for four years
23    and kept giving me one excuse after the other, and after four
24    years, he says the building says no.  If that's not a lack of
25    respect and a lack of just -- how dismissive of me could you
```

1    be?  And he was that way because I was a female.  I guarantee

2    you he would not have done that to the males in that office.

3    There is no way.

4         Q    Do you understand that the -- the results of the

5    desk audit -- the decision on whether to approve the request

6    or deny the request --

7         A    Uh-huh.

8         Q    Let me strike that.  Who made the decision to deny

9    the desk audit request?

10        A    The building.

11        Q    Do you -- do you know, in terms of an actual

12   person, who --

13        A    I asked him.  I said who in the building denied the

14   desk audit?  The building.  He couldn't -- he couldn't tell

15   me who.

16             So, someone -- the building itself, the walls --

17   said, Chris, don't do this for Debra.  That's how much

18   respect he had for me, that he couldn't even answer my

19   question.

20        Q    Aside from what you've -- what you've already

21   explained to this point, do you have anything else you want

22   to add about the reasons you felt Mr. Tillery's efforts to be

23   superficial?

24        A    Other than the fact that he told me and agreed with

25   me and attested to that fact and wrote it -- he wrote this

Page 66

1    and sent emails to the fact that I was doing GS-15 work for

2    years and never managed to give me a desk audit?  Four years

3    later, he comes in and says, oh, by the way, Debra, you're

4    not going to get a desk audit.  Why?  Well -- and my question

5    is, well, how long have you known this, you know?  How long

6    have I been doing GS-15 work and you knew I was not going to

7    get a desk audit?

8              So, you continued to let me do GS-15 work for

9    years, knowing I was not going to get a desk audit, and you

10   just let it go, because you didn't have anybody else to

11   replace me?

12             There was no one else that could do my job?  Not

13   even my supervisor could do my job?

14             So, you just let it go.  You let me continue to do

15   it without being compensated, without being recognized for

16   doing what I was doing, continued to use me and abuse me till

17   I was used up, and then turn around and say, sorry, Debra,

18   you're not going to get a desk audit, and you know, I see

19   later we're going to take whatever GS-15 responsibilities you

20   have and put them in the new supervisory job that I'm going

21   to create.

22             So, I don't know how much more I could add to that

23   at this point.  I might add something later.

24        Q    Okay.  Let's flip to page 210 of the ROI, and this

25   -- the part of the ROI I'm going to ask you about is this

1           BY MR. SCHAEFER:

2       Q    In the earlier email from Mr. Tillery we looked at,

3   it said that -- Mr. Tillery said that he sent this request

4   for a desk audit in 2012.  Do you recall that we looked at

5   that email?

6       A    That we looked at it?

7       Q    Yes.

8       A    Yes.

9       Q    And is it your understanding that this request --

10  the final version of this request was sent sometime around

11  2012?

12      A    I was told, but I never saw any evidence of that

13  whatsoever, and let me point out that if this was the final

14  version, all these would be initialed.

15      Q    Okay.

16           In the first paragraph under the summary, it says,

17  "This memorandum requests a desk audit to reclassify the

18  position of the manager of the NIJ standards and testing

19  program from GS-1301-14 to a GS-1301-15.  This position is

20  assigned to the Office of Science and Technology.  The

21  incumbent is Debra Stoe."  Do you see that?

22      A    Yes.

23      Q    All right.  And then in the next paragraph, it

24  says, "We believe strongly that the desk audit will

25  demonstrate the need for this reclassification.  The duties

1   and responsibilities of this position, and the skills needed

2   to accomplish them successfully have increased significantly

3   under Ms. Stoe's stewardship."  Do you see that, also?

4        A    Yes.

5        Q    Okay.  And do you understand this to be a draft of

6   the final memo that went to HR requesting a desk audit for

7   you?

8        A    I repeat, I never saw the final.  I never saw the

9   final.  I asked for the final.  I never received the final or

10  saw the final packet that went forward.

11       Q    Okay.  Well, let me -- let me slightly rephrase,

12  then.

13            Do you understand this to be one of the drafts that

14  you and Mr. Tillery and Mr. -- and Mr. Hart were working on

15  in the preparation of the --

16       A    Yes.

17       Q    -- of the request?

18       A    It looks familiar.

19       Q    And you had an opportunity to review this during

20  the drafting process?

21       A    Yes.

22       Q    And did you contribute some of the -- the substance

23  of what's in this -- this memo?

24       A    Yes.

25       Q    And as you said before, there were a number of

Page 71

1    rounds of rewrites of this?

2         A    Yes.

3         Q    And then, skipping to the final page, under the

4    conclusion, it says, "As demonstrated, the current duties

5    being performed by Ms. Stoe and that will be required of the

6    physical scientist directing standards and testing policy and

7    programs going forward are far above those of a GS-1301-14."

8    Do you see that?

9         A    Correct.  Yes, I do.

10        Q    Understanding that this may not be the final

11   version, do you believe that this memo accurately states the

12   case for the reasons why you should have been entitled to a

13   desk -- to a desk audit from GS-14 to GS-15?

14        A    I think that it, in its draft form, reflects a lot

15   of the duties and responsibilities that I had at the time,

16   and had been performing, as I said, for 10 years, at an

17   exceeding level, I might add again.  It wasn't just barely

18   doing it.  I exceeded in every area, every category, for

19   years.  So, yes, this represents most of the duties that I

20   was doing, not to the -- it doesn't include all the details

21   and all the accomplishments that I made during those four

22   years, but it reflects at a high, 30,000 level, yes.

23        Q    And I think you said before, during the drafting

24   process, you were -- you wanted them just to submit it,

25   right?

Page 72

1            MS. QUINN:  Objection to the form.

2            BY MR. SCHAEFER:

3       Q    You felt that Mr. Tillery was being overly --

4  "burdensome" is not the right word, but making unnecessary

5  revisions to the draft.  You thought it was ready to go, by

6  and large, yes?

7       A    Right.  The revisions -- an example of a revision

8  would be, well, let's move this paragraph up there and that

9  one down here.

10           In the big scheme of things, it mattered nothing at

11  all.  It added nothing.  And sometimes he added and edited

12  things that actually took it down a notch or maybe conveyed

13  the wrong message.

14      Q    Did you ever see a version of the final draft that

15  went to the HR?

16      A    I received a package that I was told was the

17  package that went to HR, but it did not have any of the

18  signatures signed.  So, without those signatures, without

19  those initials, I don't know that it was the final package.

20      Q    Okay.

21           Now let's flip back to page 104 of the ROI.  I'm

22  just going to say for the record -- and I'll give you a

23  chance to take a look at this, Ms. Stoe -- the top of page

24  104 says "Attachment B, memo drafted by Dave Hart and Mr.

25  Tillery referred to D. Stoe's GS-15 responsibilities."

Page 73

```
 1              So, go ahead and take a minute to take a look at

 2    this one.  It runs from page 104 through 107.

 3              MR. SCHAEFER:  And we can take a break after we

 4    finish this document, if you guys want.

 5              MS. QUINN:  Great.

 6              (Witness examining document.)

 7              THE WITNESS:  Okay.

 8              BY MR. SCHAEFER:

 9        Q    Ms. Stoe, this is a memorandum from Chris Tillery

10    to James Burch II, Deputy Assistant Attorney General, Office

11    of Justice Programs, through McCarthy, Laub, and Rose, and

12    the subject line says, "Request for exception to hiring

13    freeze."  Do you see that?

14        A    Yes, I do.

15        Q    Have you ever seen this document before?

16        A    It looks familiar.

17        Q    What do you understand this to be?

18        A    This was to -- it's my understanding this was going

19    to Burch, who was, I thought, the acting at the time, but

20    maybe not, and this goes back to what I was referring to

21    earlier.  There was always some reason not to move the desk

22    audit forward, and this refers to the hiring freeze at the

23    time.

24              But let me also mention -- and I want to go back to

25    the previous document -- there is no date on here, and so,
```

Page 74

1    it's very difficult to say.  You know, I'm not sure why they

2    left the date off, but you know, it makes it very difficult

3    to say when these documents were actually generated or moved,

4    one way or the other.  Same thing goes for the one we just

5    looked at.  There's no dates on there.

6         Q    All right.  So, you don't know when -- when, if

7    ever, this memo was sent either.

8         A    Correct.

9         Q    Okay.

10              This one says, "This memorandum requests an

11   exception to the hiring freeze to support reclassifying the

12   position of the manager of the NIJ standards and testing

13   program from GS-1301-14 to a GS-1301-15."  Do you see that?

14        A    Yes, I do.

15        Q    Do you recall having any conversations with Mr.

16   Tillery about him seeking an exception to the hiring freeze?

17        A    I don't recall.  I think that, you know, at one

18   point, he did mention that he was going to have to generate a

19   request to get an exception to the freeze.

20        Q    Do you recall when the hiring freeze was in place?

21        A    I don't know for certain.  I think it was around

22   2011 through 2012 or 2010.  I just don't recall.  But I'm

23   sure you could find out.

24        Q    All right.  And the next paragraph says, "A

25   separate memorandum has been submitted to HRD requesting the

1  desk audit needed to reclassify this position.  HRD directed

2  that this request for waiver be submitted concurrently."  Do

3  you see that?

4       A    Yes, I do.

5       Q    All right.  Do you understand who he's referring to

6  when he says HRD?

7       A    Human Resource Department.

8       Q    And do you understand that to be a reference to the

9  request for desk audit that we just looked at earlier?

10      A    I'm not certainly.  I don't know if he's talking

11  about that desk audit or if he just spoke with somebody in

12  HRD that said you should do this.

13      Q    And here again, Mr. Tillery says, "We believe

14  strongly that the desk audit will demonstrate the need for

15  this reclassification.  The duties and responsibilities of

16  this position and the skills needed to accomplish them

17  successfully have increased significantly under Ms. Stoe's

18  stewardship."  Do you see that?

19      A    Yes.

20      Q    Do you disagree with that statement?

21      A    No.

22      Q    And just jumping through a few of the assertions

23  that Mr. Tillery makes here in this memo, on the top of the

24  next page, page 105, he says -- well, skipping back to the

25  bottom of 104, "The need for this reclassification is the

Page 76

```
 1    direct results of Ms. Stoe's understanding that new
 2    approaches were needed for the standards and testing program
 3    to reach its full potential, and the changes that she has
 4    made in it to achieve that goal."  Do you see that?
 5         A    Yes, I do.
 6         Q    And then he says, "The first change was a radical
 7    revision to how NIJ develops standards."  Do you agree with
 8    that statement?
 9         A    Yes.
10         Q    And a couple paragraphs down, he continues.  "The
11    second change Ms. Stoe implemented was revision of NIJ's
12    compliance testing program to bring it in line with
13    recognized international standards."  Do you see that?
14         A    Yes.
15         Q    And do you agree with that statement?
16         A    Yes.
17         Q    And then a few more paragraphs down, "The third
18    change Ms. Stoe implemented was establishing an interagency
19    and interdepartmental steering committee at the Senior
20    Executive Service level to guide and coordinate NIJ standards
21    and testing activities with those of relevant standard
22    development organizations and other stakeholders."  Do you
23    see that?
24         A    Yes.
25         Q    Do you agree with that comment, as well?
```

Page 77

1      A    Yes.

2      Q    And I'm not going to touch on every single point in

3  this, but I do want to also bring your attention to -- on the

4  next page, where Mr. Tillery says, "Ms. Stoe's work is

5  internationally recognized, resulting in an invitation from

6  the International Personal Armor Committee (IPAC) to chair

7  the test standards and methodology session at the Personal

8  Armor Systems Symposium (PASS) in Quebec, Canada, in 2010."

9  Do you see that?

10     A    Yes.

11     Q    And do you agree with that statement, as well.

12     A    Yes.

13     Q    Okay.

14          Is there anything in here that you've seen in your

15  review of this memo today that you -- you disagree with?

16     A    No.  Not that I see today at this moment, no.

17     Q    Do you find this to be a generally appropriate

18  request for exception to the hiring freeze?

19          MS. QUINN:  Objection to the form.

20          THE WITNESS:  I have no idea.  I mean, I don't know

21  what the requirements are to submit a request for exemption.

22  I don't know what the minimum requirements or what the

23  template should be used or what the hierarchy, who it should

24  go to.  I'm not familiar with that.

25          BY MR. SCHAEFER:

1     Q    Setting aside that, just in terms of the substance

2  of what's in here, is there anything in here that you --

3  anything substantial that you think is missing from his --

4  his request for this exception?

5          MS. QUINN:  Objection.  She's going to have to read

6  the whole thing before she can answer general statements

7  about the entire document.

8          THE WITNESS:  You're asking me if more could be

9  added or if something is missing?  I can't -- more could be

10  added to this.  I'm sure that -- I'm positive there's things

11  that I did and was doing and had accomplished that's not

12  included in here, but to able to say if it's missing means

13  that I have to know that it was necessary to be in there, and

14  I don't know what the requirements are.

15          MR. SCHAEFER:  Okay.  That's fair.  We can -- we

16  can stop there.  Let's take a break.

17          MS. HUHTA:  Do you want to just take a quick break

18  or did you want to take lunch now, or what are you thinking?

19          MR. SCHAEFER:  I'm happy to try to keep moving

20  through, at least for like another session, if you guys want.

21  We can certainly break for lunch if that's what you prefer.

22          (A brief recess was taken.)

23          MR. SCHAEFER:  All right, Ms. Stoe.  We're back on

24  the record.

25          THE WITNESS:  Okay.

1          MR. SCHAEFER:  And if you wouldn't mind turning to

2    page 136 of the ROI -- now, I'm going to ask you about pages

3    136 through 140.

4          BY MR. SCHAEFER:

5     Q     And the first question is just, do you recognize

6    this as the -- the vacancy announcement on USA Jobs for the

7    supervisory program manager position?

8     A     Yes, it appears to be the same one.

9     Q     And before I had asked you about whether you knew

10   what the salary was for -- for the supervisory program

11   manager position.

12         If you look at the -- near the upper half of the

13   first page here, on page 136, where it says "Salary range" --

14   do you see that?

15    A     Yes.

16    Q     And so, this vacancy announcement has a salary

17   range of $124,995 to -- I can't really read that -- 157,100?

18   150-something thousand.  Is that right?

19    A     Yes.  150-something, yes.  That's what it looks

20   like to me.

21    Q     Do you recall what the -- what it was, the upper

22   end of the range?

23    A     I don't.

24    Q     And this is for a GS-15 position, correct?

25    A     Correct.

1      A    No.  I don't know the exact dates.

2      Q    Do you recall whether it was before you filed your

3  EEO complaint?

4      A    Yes, it was -- I filed more than one FOIA, so some

5  were before the EEO and some were after.

6      Q    And do you recall if this was a document you

7  received before you filed your EEO complaint?

8      A    I don't think so.  I do not recall.  I would have

9  to go back and check.

10     Q    Now, there are a couple of places in this memo

11  where there are some black bars.  Do you see that?

12     A    Yes.

13     Q    Redactions?

14     A    Yes.

15     Q    Have you ever seen this memo in its unredacted

16  form?

17     A    Yes.

18     Q    But this is -- this is the document in the form

19  that you received it from your FOIA request, correct?

20     A    Correct.

21     Q    And what was the -- what was your age at the time

22  you applied to this position?

23     A    Sixty.

24     Q    And Mr. Tillery has stated in the -- the testimony

25  he provided to -- during the EEO process that he didn't know

Page 88

1    Human Resources Division?

2        A    Yes.

3        Q    Now, Ms. Duncan says that -- in paragraph two of

4    her declaration -- "Debra Stoe's name appeared on the first

5    merit promotion certificate issued," and in the -- the next

6    paragraph, which is paragraph three, she says that that

7    certificate was issued on May 8, 2014.  Do you see that?

8        A    Yes.

9        Q    Ms. Duncan says that this first notice was issued

10   in error.  It was in error, because it was without regard to

11   numerical ranking.  Do you see that, also?

12       A    Yes.

13       Q    Do you have any reason, in your own view, to

14   dispute Ms. Duncan's testimony about the fact that this first

15   notice was issued in error?

16       A    No.

17       Q    And so, she says that the HR specialist marked the

18   list inactive and deactivated that first certificate.  Do you

19   have any reason to doubt the truth of that?

20       A    Number five?

21       Q    Yes.

22       A    No.  I have no reason to doubt that.

23       Q    Okay.  Then it says, in paragraph six, still on May

24   8, 2014, just moments after the first merit promotion

25   certificate was rendered inactive, the HR specialist issued a

Page 89

1    second certificate comprised of 18 applicants with the

2    highest numerical ranking, which we were referred to the

3    hiring manager.  "Ms. Stoe's name did not appear on the

4    second merit promotion certificate issued on May 8, 2014."

5    Do you see that?

6         A    Yes.

7         Q    Do you recall receiving a second merit promotion

8    certificate on May 8th?

9         A    No, I just received one, and there was no

10   indication that it was a merit promotion certification.  It

11   just says you've been -- your name has been found -- that

12   you've qualified and your name has been forwarded to the

13   selecting official.  It did not name the certification list

14   that it was on.

15        Q    Okay.  And as far as you recall, you only recall

16   receiving one notification on that date?

17        A    Correct.

18        Q    Do you have any reason to dispute Ms. Duncan's

19   testimony that your name didn't appear on the second merit

20   promotion certificate?

21        A    No.

22        Q    Okay.  And then, Ms. Duncan continues that, on May

23   21, 2014, the hiring manager requested a larger pool of

24   candidates, because his review of the second merit promotion

25   certificate left him thinking that none of the candidates on

1   the certificate were going to be a particularly good fit for

2   the vacant position.  Do you see that?

3       A   Yes, I do.

4       Q   And so, then Ms. Duncan says that she, upon her

5   review, determined that the second certificate -- I'm

6   paraphrasing here a little bit, but -- didn't have a

7   meaningful break in the number of candidates on that list,

8   and so, she directed the HR specialist to issue an amended

9   certificate on June 3rd.  Do you see that?

10      A   Yes.

11      Q   And then, she says that "Ms. Stoe's name appeared

12   on the third merit promotion certificate which was issued on

13   June 3rd."

14          Now, as you testified earlier, you recall receiving

15   a notification on or about June 3rd that you were deemed to

16   be qualified, correct?

17      A   Correct.

18      Q   Now, at the time when you received the two separate

19   notifications in May and then in June, how did you -- strike

20   that.

21          Did you think there was something suspicious about

22   the fact that you received two separate notifications?

23          MS. QUINN:  Objection to the form.

24          THE WITNESS:  "Suspicious" is not accurate.  I

25   could not understand why I was getting two notifications.

1        Q     And did you ever speak to anybody in human

2   resources or in the selection process about why you had

3   received two notices?

4        A     I don't think so.  In human resources, I don't

5   believe so.  I can't guarantee that, but I don't believe so.

6   I think the first time would have been with EEO.

7        Q     And that was when you initiated your complaint,

8   yes?

9        A     Correct.

10       Q     Okay.

11             Now, turning back to the memorandum for record

12   that we were looking at on page 122, in this memorandum for

13   record, on page 123, in the first full paragraph there --

14       A     Uh-huh.

15       Q     -- Mr. Tillery wrote, "The initial certificates for

16   the job announcement received on May 14, 2014, in initial

17   screening indicated that none of the candidates were ideal

18   with respect to their ability to serve as one of the two

19   alternate DOJ standards executives.  Consequently, on May 21,

20   I requested that the OJP Human Resources Division (HRD)

21   consider expanding the pool or candidates.  That request was

22   granted.  The competitive promotion certificate for this

23   announcement was reissued on June 3, 2014, and contained 77

24   applicants."

25             So, first I'm just going to ask you, did I read

1    that correctly?

2          A    Yes.

3          Q    And when you -- when you received this -- a copy of

4    this memorandum back when you filed your FOIA request --

5          A    Uh-huh.

6          Q    -- did you believe that you were among the

7    candidates in the initial screening who Mr. Tillery said were

8    not ideal with respect to their ability to serve as one of

9    the two alternates?

10         A    Yes, I did.

11         Q    And do you now understand that -- that you were not

12   among those candidates from that initial screen who he was

13   referring to?

14         A    No, I don't.

15         Q    You don't have that understanding?

16         A    No.

17         Q    Well, in Ms. Duncan's declaration, she -- she

18   stated that you were not among the candidates who were in the

19   corrected notice.  We can go back and take a look at it if

20   you want.

21         A    Sure.

22         Q    Okay.  This is on page 366.

23         A    366.  Yep.

24         Q    And in paragraph seven, Ms. Duncan stated that

25   "Ms. Stoe's name did not appear on the second merit

Page  93

1   promotion certificate that was issued on May 8th."  Do you

2   see that?

3        A    Yes, I do.

4        Q    And -- and let me ask you, do you have any reason

5   to doubt the truth of Ms. Duncan's statement that your name

6   was not on the second merit promotion certificate?

7        A    No.

8        Q    Okay.

9             So, then, coming back to my question about what Mr.

10  Tillery said in his memorandum for record, what I wanted to

11  ask you is -- is whether you understand, sitting here today,

12  that when Ms. Tillery -- Mr. Tillery wrote, "An initial

13  screening indicated that none of the candidates were ideal

14  with respect to their ability to serve as one of the two

15  alternate DOJ standards executives," what I want to -- what I

16  want to know is whether, sitting here today, you understand

17  that that candidate pool that he is referring to did not

18  include you.

19       A    I don't understand that statement.  I understand

20  your statement.  I don't understand his statement.

21       Q    What do you -- what do you find to be confusing

22  about his statement?

23       A    Because he said that no one in the initial

24  certificates was ideal to the ability to serve as two

25  alternative DOJ standards executive.

1       Q    So, are you saying that you read him to be saying -
2  - be referring to the first certificate that was issued in
3  error?
4       A    There were four certificates.
5       Q    When were the -- when were the four certificates?
6       A    All on the same day, May 8th.  If you look at the
7  ROI, you'll see that there's four certificates that were
8  distributed on the same day, and there were four certificates
9  distributed on 6/2.
10           We have standard Schedule A, you have merit
11  promotion, you have competitive promotion, and then you have
12  a fourth one, which I don't recall right this second.
13  There's four certificates, which is why, on page 366, she
14  says my name did not appear on the merit promotion, but it
15  did appear on one of the other certificates.
16       Q    So, do you -- do you understand Mr. Tillery to be
17  referring to a screening list that's a different list than
18  one Ms. Duncan is referring to with this merit promotion
19  certificate?
20       A    I'm not going to try to interpret what Chris was
21  trying to say or probably not say.  I think it was -- you
22  know, I just -- I'm just telling you that there were four
23  certificates, and when he says the initial certificates did
24  not have someone that was ideal, that he's referring to all
25  four certificates, and I believe somewhere in the

Page 95

1  documentation he refers to the four certificates that I

2  received, there was no one that was ideal.

3      Q    So, let's just -- I want to be clear about this

4  point.

5          So, are you contending that there is something

6  discriminatory or improper in this initial screening of the

7  candidates as to your application?

8      A    I'm saying that I should have been chosen, that I

9  was not selected, and I was the most qualified person, by

10  far, to do that job.

11          How it was done, how it was manipulated, I don't

12  know, but I can tell you that that was my job, and I was not

13  selected, and this is Chris' justification for asking for

14  changes to be made to the process to fill the vacancy, and

15  that's what I know.  That's where the data will take it.

16     Q    And we'll -- we'll go through the other aspects of

17  the selection process.  I really just want to, for the

18  moment, focus on -- on this piece of it.

19          Mr. Tillery has testified in his declaration in

20  this ROI that when he was saying there were no ideal

21  candidates that that didn't include -- that didn't include

22  your application.

23          So, what I'm -- what I'm trying to ask you just at

24  this moment is whether you're alleging that this initial

25  screening and the fact that there were multiple notices --

Page 96

1   are you alleging that there was something discriminatory

2   about that aspect of the selection process?

3       A    What I'm saying --

4            MS. QUINN:  I'm going to object.  The document

5   speaks for itself.  She can't testify as to what Chris

6   Tillery meant when he drafted the document.

7            MR. SCHAEFER:  You can answer the question.

8            THE WITNESS:  What I'm saying is that this

9   justification that was written to support Chris' request is

10  inaccurate.

11           This justification says that there was changes made

12  to the merit promotion certificate.  I'm saying that there

13  were four certificates issued, and I was among the four, not

14  the merit promotion but among the others, so -- which is why

15  he refers to the initial certificates.

16           So, when Chris says that -- that none of them

17  exhibited the ability to serve as one of the two

18  alternatives, was ideal, I believe he was discriminating

19  against me.

20           BY MR. SCHAEFER:

21      Q    And you under -- you understand him, when she says

22  none of the candidates were ideal, you understand that to

23  include you.

24      A    Absolutely.

25      Q    Okay.

1      A    I feel that what I've already mentioned is -- it's

2  my belief that I was among the first -- I was on the first

3  certificates, plural, that were issued, and when you come

4  down to -- he asked for this to be opened up, because when

5  you come down to the third paragraph, where it says, "All OJ

6  applicants on the certificate must be interviewed."

7          So, if -- if neither Mark or Joe had been on the

8  certificate that I was included on, then they would not have

9  been able to receive an interview.  That's my belief.  And I

10  believe that Chris generated this email to justify that, even

11  though it's not accurate.

12     Q    Are there any other parts of the selection process

13  that you feel are discriminatory towards -- towards you?

14  Like, for example -- and I understand that -- we'll set this

15  aside for a moment -- that you -- you believe that the -- the

16  non-selection was discriminatory.

17          What I'm asking here more is, are there any aspects

18  of this selection process -- for example, are there certain

19  questions that were asked during the interview that are --

20  that you believe are biased towards women or towards the

21  elderly or are there any -- were the selection criteria that

22  was used to do the rankings discriminatory or biased?

23          Are there anything -- are you making any

24  allegations in this case that there are any parts of the

25  selection process that are discriminatory?

1      Q    Is there anybody else in addition to Mr. Tillery

2   who you believe discriminated against you in this selection

3   process?

4      A    Maria.

5      Q    Tell me a little bit more about that.  Why do you

6   think Maria discriminated against you?

7      A    When I read the additional documents that came with

8   the ORI, it was clear to me that, okay, Chris somehow managed

9   to convince Maria, because when he says I'm going to separate

10  the 77 and he did that -- and this is in the documents, and

11  you can find it -- he sent my name to Maria.

12          Well, her first record that came back had me down

13  as a zero, which meant, guess what, I didn't get an

14  interview.

15          Well, guess what?  There was no way that Gordon

16  Gillerman was going to say that Mark or Joe Heaps was

17  qualified to do this job, because Gordon Gillerman is an

18  expert in standards and testing and methodologies, right?  He

19  was with me when we built the body armor standard.

20          No way was he going to say either of those two

21  people were qualified to do this job.

22          So, now, Chris is in a position where no one -- he

23  can't get Mark in front of the interview panel.  He can't get

24  in there, because there's no way that Gillerman was going to

25  do it.

1            So, he goes to Maria and he says I need you to

2    change Debra's score so I can get her in front of the panel,

3    and if I can get her in front of the panel, then I can get

4    Mark and Joe in front of the panels, and that's exactly what

5    happened.

6            So, the next time you see this --

7            MS. QUINN:  Debra, I'm just going to counsel you to

8    focus on answering the question.

9            THE WITNESS:  Okay.  So --

10           MS. HUHTA:  And maybe we should --

11           MS. QUINN:  -- stop speculating.

12           MR. SCHAEFER:  So --

13           MS. QUINN:  Maybe we should break for lunch,

14   actually, before you ask another question, if possible.

15           MR. SCHAEFER:  Well, let me just try to -- we'll

16   break soon.  Let me just try to finish up this one -- one

17   line of inquiry here.

18           BY MR. SCHAEFER:

19      Q    In your last answer, you -- you stated that you

20   believe that Mr. Tillery went to Ms. Swineford and had her

21   change her scores.

22      A    Yes.

23      Q    What's the basis for your belief that he did that?

24      A    So that he could get me in front of the interview

25   panel.

1      Q    What makes you think that he went to her and asked

2   her to change her scores?

3      A    Because he wanted me in front of the interview

4   panel.  Did I misunderstand your question?

5      Q    Well, what I'm trying to get at is -- is, like, for

6   example, did Mr. Gillerman ever tell you that Mr. Tillery was

7   having us change our scores?

8      A    No.

9      Q    Did Maria ever come to you and say Mr. Tillery came

10  and -- and asked me to change my score?

11     A    No.

12     Q    Has -- have you ever seen a document that

13  demonstrates to you that Chris Tillery had Ms. Swineford

14  change her score?

15     A    I saw a document from Ms. Swineford where she had

16  rated me a zero in one particular category, and then I

17  believe, based on the dates -- and -- and I could be mistaken

18  by a day or two -- the next day, the same document was

19  resubmitted, and now I had a one in this particular category,

20  where she had me as a zero, and now I qualified for an

21  interview.

22     Q    What makes you think that she -- she didn't just

23  change her mind and change the score?  What makes you think

24  that that was because Mr. Tillery came and asked her to

25  change her score?

1      A    Because she didn't know me.  She would have no

2  reason to change the score.

3           MR. SCHAEFER:  We're almost done, then we can

4  break.  A couple more quick questions.

5           BY MR. SCHAEFER:

6      Q    Are you alleging that Mr. Gillerman discriminated

7  against you?

8      A    No.

9      Q    Are you alleging that Mr. Ridgeway discriminated

10  against you?

11      A    I did not use those words in my initial

12  discrimination case, so I don't know if I can change that or

13  not.  Do I think that -- I don't know.

14      Q    Okay.

15           Is there anyone besides -- that we haven't covered

16  -- besides Tillery and Swineford who you believe was acting

17  with discrimination or bias against you during this process?

18      A    Is there anyone else?  Not to my knowledge at this

19  time.

20      Q    Okay.

21           MR. SCHAEFER:  We can -- we can break there and get

22  some smoothies or whatever else you want.

23           (Whereupon, at 1:18 p.m., a luncheon recess was

24  taken.)

25

1    And just to -- for the sake of clarity, I understand that

2    there are allegations in this case that relate to the

3    background of Ms. Stoe's request to have the position

4    upgraded and the desk audit.  I understand that those

5    allegations are -- they're alleged in the complaint.  You --

6    you believe that they're relevant to the non-selection.  I'm

7    simply just wanting to confirm that --

8              MS. HUHTA:  I understand.

9              MR. SCHAEFER:  -- that the claims relating to those

10   earlier events is --

11             MS. HUHTA:  I understand.

12             MR. SCHAEFER:  Okay.  All right.  Okay.  Let's go

13   to page 119 of the ROI, and this email runs, also, onto page

14   120.  Feel free to take a moment to review.

15             (Witness examining document.)

16             THE WITNESS:  Okay.

17             MR. SCHAEFER:  All right.

18             BY MR. SCHAEFER:

19      Q    This is an email from George Tillery, dated May 21,

20   2014.  Do you see that?

21      A    Yes.

22      Q    And the subject line reads, "Trying to figure out

23   how best to review applications to JP1472, would appreciate

24   HRD input," correct?

25      A    Correct.

```
1        Q     Okay.  And this email went to Summer Duncan, among

2   others, yes?

3        A     Yes.

4        Q     Okay.  Have you ever seen this email before?

5        A     Yes.

6        Q     And was this one of the documents that you received

7   in response to your FOIA request?

8        A     To one of them, yes.

9        Q     And were you copied on this email at the time it

10  was sent?

11       A     No.

12       Q     Had you seen the email before you received your

13  FOIA --

14       A     No.

15       Q     -- the response to your FOIA?

16       A     No.

17       Q     All right.  Let's jump down to the -- the paragraph

18  that's just above the first big redacted paragraph, and Mr.

19  Tillery appears to have written, "The problem I am struggling

20  with is that none of the candidates in the four active

21  certifications for this position appears ideal."  Do you see

22  that piece?

23       A     Yes.

24       Q     Okay.  And we asked some questions about this issue

25  with regard to another document, that memorandum of record.
```

1    Do you recall that testimony?

2         A    Yes.

3         Q    And just to confirm, your belief is that when Mr.

4    Tillery writes here that none of the candidates in the four

5    active certifications for the position appears ideal, you

6    believe that -- that you were among the candidates he's

7    referring to there?

8         A    Yes.

9         Q    And he continues, "This is because the technical

10   qualifications on which applicants are asked to grade

11   themselves, which serves as the basis for their rankings,

12   talk to general skill levels and not to specific experience.

13   For that, you have to go into the applicants' resumes."  Do

14   you see that?

15        A    Yes.

16        Q    And -- and then on the next page, the email

17   continues.

18             "My plan is to send the 36 candidates on the active

19   certifications to the two other members of our panel for

20   review to determine which, if any, should be invited for an

21   interview besides the one applicant from Schedule A."  And

22   then in the next paragraph, the second complete paragraph

23   from the bottom, it says, "Is there a better way to do this?

24   Can I get" -- and there's a redaction -- "in front of the

25   panel for consideration without having to go through two

Page 119

1    rounds of review?  Don't get me wrong.  If personnel

2    regulations require two rounds of review, then so be it."  Do

3    you see that?

4         A    Yes, I do.

5         Q    And when you received this email in response to

6    your FOIA request, did you know who -- who is being referred

7    to there in the portion of that sentence I just read to you

8    that's redacted, who that refers to?

9         A    No.

10        Q    Do you -- sitting here today, do you know who that

11   refers to?

12        A    Yes.

13        Q    Who does it refer to?

14        A    When I received the unredacted copy of this, the

15   word -- the name that was in there was Higgins.

16        Q    At the time you received that, did you believe that

17   to be a reference to Dr. Greene?

18        A    You mean when I received with the redacted --

19        Q    Yes.

20        A    Yes, I believed it was Dr. Greene.

21        Q    And let's take a look at the unredacted version

22   here.

23             MR. SCHAEFER:  What number are we on now?

24             THE REPORTER:  Four.

25             MR. SCHAEFER:  Four.

Page 120

1                              (Exhibit No. 4 was marked for

2                              identification.)

3              MR. SCHAEFER:  I'm handing to you an exhibit that's

4      been marked as Exhibit 4.

5              (Witness examining document.)

6              MR. SCHAEFER:  Feel free to take as much time as

7      you need to review that.

8              (Witness examining document.)

9              THE WITNESS:  Okay.

10             MR. SCHAEFER:  Okay.

11             BY MR. SCHAEFER:

12       Q    So, at the very bottom of the first page of this

13     email is a paragraph that starts, "Among the candidates not

14     certified is a former director of the National Institute of

15     Standards and Technology (NIST), Office of Law Enforcement

16     Standards (OLES), from 1994 to 2007."  Do you see that?

17       A    Yes.

18       Q    Do you know who that refers to?

19       A    Yes.

20       Q    Who does that refer to?

21       A    Ms. Higgins.

22       Q    Ms. Higgins was the direct of NIST OLES during that

23     time period?

24       A    Of OLES, yes.

25       Q    And Mr. Tillery says, "As such, she was responsible

1    for administering NIJ's conformity assessment program.  There

2    she managed a $50 million budget with a staff of engineers

3    and scientists," and then the paragraph continues.  Do you

4    see that, as well?

5        A    Yes.

6        Q    Do you understand this to -- the point Mr. Tillery

7    is trying to make here is that Ms. Higgins was not among the

8    -- the candidates in this initial screening, correct?

9        A    Correct.  But may I add that his statement is

10   incorrect, because she did not administer NIJ's conformity

11   assessment program.  NIJ did not have a conformity assessment

12   program, so he was wrong in that statement, just for

13   clarification.

14       Q    Okay.  I appreciate that.  But you don't disagree

15   with -- with my -- my statement that he's -- he's -- he's --

16   the basic point he's making here is that Ms. Higgins is not

17   among the people that have been screened for this.

18            MS. QUINN:  Objection to the form.

19            THE WITNESS:  He is making a statement that among

20   the candidates not certified is a former director.  So, I

21   don't know if he's talking -- I don't know exactly what he's

22   saying.

23            MS. QUINN:  If you don't know, don't speculate.

24   The document speaks for itself.

25            MR. SCHAEFER:  Okay.

Page 122

1          BY MR. SCHAEFER:

2     Q    So, then if we flip to the next page, the paragraph

3     that reads, "Is there a better way to do this?" -- and it

4     says "Can I get Ms. Higgins in front of the panel for

5     consideration?"  Do you see that?

6     A    Yes, I do.

7     Q    Okay.  And that corresponds with the -- the portion

8     of the redacted version of this memo we were just looking at

9     in the ROI, right?

10    A    Correct.

11    Q    Okay.

12         Do you know Ms. Higgins?

13    A    Yes, I do.

14    Q    Have you ever -- have you worked with her?

15    A    Yes.

16    Q    How -- how often would you have occasion to -- to

17    interact with her in your position?

18    A    I interacted with her quite a bit initially, the

19    first four or five years, and then less so after that,

20    because we stopped working with NIST as much, so -- and then

21    I would occasionally see Ms. Higgins at two different

22    meetings, typically the ASTM and IEB.

23    Q    And do you know approximately how old Ms. Higgins

24    was at the time of the application?

25    A    No.

1      A    Okay.

2      Q    And the recipients are Summer Duncan, Ludonlar

3   Calahan.  Do you see that?

4      A    Yes.

5      Q    And copies to Portia Graham and LaKisha Honore.  Do

6   you see that?

7      A    Yes, I do.

8      Q    Okay.

9           So, with that understanding, do you understand this

10  email we're looking at here in Exhibit 4 to be what you're

11  referring to?

12     A    Yes.

13     Q    And then you write in your response, referring to

14  this email on May 21, "In his email, Mr. Tillery stated that

15  'None of the candidates in the four active certifications

16  containing 146 candidates for the position appeared ideal.'"

17     A    Correct.

18     Q    And then you say, "Apparently I was one of these

19  non-ideal candidates."  Do you see that?

20     A    Yes.

21     Q    And as you said before, that's -- that's your

22  belief today, that you were not -- that you were one of the

23  non-ideal candidates, right?

24     A    Correct.

25     Q    And then you say --

Page 132

```
 1        A     Can I rephrase that?  Not that I was non-ideal,

 2   that I was one of the candidates.  That's his statement that

 3   I was --

 4        Q     Understood.  Thank you for the clarification.  I

 5   didn't mean to suggest that.  I just wanted to confirm your

 6   position that he was referring to you.

 7        A     Yes.

 8        Q     Yes.

 9        A     That I was one of the 146.

10        Q     And then --

11        A     That's my belief.

12        Q     Okay.  And then your statement continues, "I know

13   another woman, Kathleen Higgins, who was also on the list of

14   146 that was forward to Mr. Tillery.  Mrs. Higgins and I were

15   two of the three finalists for the position."  Do you see

16   that?

17        A     Yes, I do.

18        Q     Okay.

19              So, here in your -- I want to understand what

20   you're saying here.

21              Are you suggesting that Ms. Higgins was also on the

22   list of candidates that Mr. Tillery was saying were non-

23   ideal?

24        A     That's what I'm saying.

25        Q     And do you believe that to -- that's your belief
```

Page 133

1    today?

2        A    Yeah.

3        Q    And does the -- does the fact that -- now that

4    we've looked at the portion of the email that was redacted,

5    where Mr. Tillery appears to be advocating for Ms. Higgins to

6    be added to the list of certified candidates, does that

7    change your view?

8        A    No.

9        Q    Why not?

10       A    I don't understand it, but it doesn't change my

11   view.  I don't know why he said that about Ms. Higgins, but

12   it doesn't change my view.

13       Q    Well, he says on the -- the second page of the

14   email, "Is there a better way to do this?"

15       A    Right.

16       Q    "Can I get Ms. Higgins in front of the panel for

17   consideration without having to go through two rounds of

18   review?"  And then in the next paragraph, he says, "Could one

19   of more of the certifications be lengthened to ensure that

20   Ms. Higgins is considered?"

21       A    Uh-huh.

22       Q    Does that sound to you like somebody that's trying

23   to keep Ms. Higgins off of the list?

24            MS. QUINN:  Objection, calls for speculation.

25            THE WITNESS:  My reasoning -- I don't know why he

 1   said Ms. Higgins.  Considering the fact that, on the list --

 2   why would he request Ms. Higgins to be included and not me?

 3   That makes no sense to me.

 4          BY MR. SCHAEFER:

 5     Q    Well, if -- if --

 6     A    If no one from OJP was on the list, why would he

 7   request the inclusion of someone not from OJP?  I'm just

 8   saying --

 9     A    For the -- for the sake of my next question, I'm

10   going to ask you to assume something, and it's -- that's

11   permissible.  I'm allowed to do that.  I want you to assume

12   for the sake of my -- my question --

13     A    Uh-huh.

14     Q    -- that Ms. Higgins is in her late 60s.

15     A    Okay.

16     Q    I know you don't know that to be true.  I'm just

17   asking you to assume it.

18     A    Okay.

19     Q    With -- with that assumption, does the fact that --

20   if you assume, for the sake of my question, that Ms. Higgins

21   is in her late 60s, does that change your view that Mr.

22   Tillery was trying to discriminate against candidates of a

23   certain age?

24          MS. QUINN:  I'm still going to object.  It's

25   calling for speculation and vague.

1          THE WITNESS:  I don't believe -- I can believe that

2   Cathy is over 60, but I don't believe that Mr. Tillery was

3   trying to get Ms. Higgins on the certification list.

4          BY MR. SCHAEFER:

5   Q    You don't take what he's saying -- you don't take

6   what he's saying here at face value.  Is that what you mean?

7          MS. QUINN:  Objection.

8          BY MR. SCHAEFER:

9   Q    That's correct?

10  A    Yes, that's correct.  I do not believe his intent.

11  Q    What do you believe his intent was in sending this

12  email?

13         MS. QUINN:  Objection, calls for speculation.

14         THE WITNESS:  Yes, it's definitely speculation, but

15  I do not believe --

16         MS. QUINN:  So, I'm going to counsel you not to

17  speculate if you don't know.

18         THE WITNESS:  Okay.  So, I cannot answer that,

19  because I don't know.

20         MR. SCHAEFER:  Okay.  So, we'll keep -- keep moving

21  here.

22         THE WITNESS:  Okay.

23         BY MR. SCHAEFER:

24  Q    So, then, if you move through your response a

25  little bit further, near the end of the paragraph or the

Page 136

1    bullet point that we were just going through in your

2    declaration --

3        A    Uh-huh.

4        Q    -- it says, "Further, he stated, 'Could one or more

5    of the certifications be lengthened to ensure that [blank] is

6    considered.'"  Do you see that?

7        A    Yes, I do.

8        Q    With the blank -- the blank being a redaction.

9        A    Yes, I do.

10       Q    And then you state, "The name was redacted, but I

11   highly suspect it to be Mr. Greene, the selectee."  Do you

12   see that?

13       A    Yes, I do.

14       Q    And do you continue to hold the belief today that

15   the name that Mr. Tillery was referring to was Mr. Greene?

16       A    I don't know the answer.

17       Q    Well, let's take a look at the email again here.

18   So, you have in front of you Exhibit 4, and let's also take a

19   look back at the redacted portion of the ROI, which is page

20   119.  I know it's a little difficult to keep multiple

21   documents in front of you, but --

22            MS. HUHTA:  I mean, if you're asking us to

23   stipulate that the unredacted version of the memo said

24   Higgins, not Greene, I mean we'll do that.

25            MR. SCHAEFER:  Okay.

1              MS. HUHTA:  I mean it's -- right?  It's a

2    document --

3              THE WITNESS:  But I will not -- and I understand

4    what my counsel is saying, but my concern is that the name

5    could be the same, but the reason could be different than

6    what's being stated.

7              MS. HUHTA:  Right.  Okay.

8              THE WITNESS:  Okay.

9              MS. HUHTA:  His motivations, the sincerity,

10   etcetera, but -- but we know -- we've got the unredacted

11   document.  We're all in agreement.

12             MR. SCHAEFER:  Okay.  Understood.

13             BY MR. SCHAEFER:

14      Q    Do you know what score you received during the

15   initial screening process, Ms. Stoe?

16      A    I'm not sure what the initial screening process

17   score was, no.  The only score that I saw was the one that

18   was given to me by the panel.

19      Q    And that's -- you're referring to the score of the

20   interviews?

21      A    I don't recall.

22             MR. SCHAEFER:  All right.  So, is this number 6?

23             THE REPORTER:  Yes.

24                              (Exhibit No. 6 was marked for

25                               identification.)

 1          BY MR. SCHAEFER:

 2     Q    So, Ms. Stoe, you were among the six or seven

 3 candidates that were interviewed for the position, correct?

 4     A    Correct.

 5     Q    And are you aware of an OJP policy that provides

 6 that if a manager interviews one internal OJP employee on a

 7 certificate list, them the manager must interview all OJP

 8 employees?

 9     A    On the same certificate list, yes.

10     Q    Yes.  And is it your understanding that it was

11 pursuant to that policy that Dr. Greene received an

12 interview?

13     A    That's what I was told.

14     Q    Do you believe that the OJP policy by which enabled

15 Dr. Greene to get an interview -- do you believe that that

16 policy is discriminatory?

17     A    I have no comment on that one way or the other.  I

18 don't -- I don't see it as discriminatory.

19     Q    Do you believe that Mr. Tillery took some action to

20 get Dr. Greene on the initial list of candidates that were

21 interviewed?

22          MS. QUINN:  I'm just going to object as it's

23 calling for speculation.

24          MR. SCHAEFER:  Let me strike that.

25          BY MR. SCHAEFER:

1    qualified, and I was like -- that, to me, was a signal of

2    some sort for him to say, if you scored less than three, you

3    weren't qualified.

4            So, I asked him right then.  I said, what did you

5    score me, Chris, and this is a man that has known me for 10

6    years and has been my direct supervisor and has signed all my

7    performance evaluations and, a month before, said that I had

8    exceeded in every category, and when I asked him, is there

9    anything that I can do to better prepare -- not better -- to

10   -- to improve myself, he said no, you cannot improve on -- on

11   excellence.  You can't improve on somebody that exceeds at

12   everything.

13           I said -- you know, because I, honest to goodness,

14   was looking for somebody to help me, you know.  If there's

15   something I can improve on, then tell me what it is, and he

16   said no.

17           So, when I asked him -- I said what did you score

18   me, Chris, and he said I can't tell you that, I knew from

19   that moment that he had discriminated against me.  I don't

20   know how.  I don't know what he did, but I knew he had

21   discriminated against me, and I was pretty certain at that

22   point that it was probably Mark Greene that had gotten it,

23   and the reason was because Mark was male, 38, and I was 60

24   years old and I was a female, and there no way that Chris

25   was going to give me a job with -- as supervision over other

Page 146

1    men.  He just wasn't going to do it, and I knew it right

2    then.

3              BY MR. SCHAEFER:

4         Q    And -- well, let me ask you first -- during your

5    initial debriefing with Chris at the time, did he share these

6    scores with you?

7         A    No.

8         Q    When did you become aware of these scores?

9         A    ROI.

10        Q    So, during -- after you filed your --

11        A    After my FOIA, or the second or the third,

12   whichever one, I got the interview sheets where I could see

13   where he scratched through my scores and scored me, you know,

14   like two to five or two to four or one to three, and I

15   thought, well, you know, he gave himself -- as an

16   interviewer, he certainly gave himself enough room to massage

17   the scores if that's what he wanted to do.

18        Q    When -- when Chris told you that you had received a

19   score -- let me just make sure I've got this right.  So, the

20   -- the reference to the three being the minimum score --

21        A    Uh-huh.

22        Q    What was that in reference to?  Was that to --

23        A    He was trying to explain --

24             MS. QUINN:  Debra, let him finish the question.

25             THE WITNESS:  I'm sorry.

1      A      No.  His -- his communication to me that day about

2  scores was unintelligible and random, and I couldn't follow

3  what he was saying, but I caught the last thing, when he said

4  if you scored less than three, you were not qualified, and

5  that's when I said wait a minute.  What did you score me?

6  Because I knew right then that he's the one that threw me

7  under the bus.

8      Q      So, he --

9      A      The other two interviewers that knew me -- Maria

10  didn't know me at all.  Gordon knew me, but he didn't work

11  with me day in and day out.  They scored me higher than Chris

12  did.

13           So, why?  Because he did not want me to be in

14  charge or supervise officially the men in the department, and

15  being 60 years old, he was -- he didn't want to give me the

16  job.

17      Q      Do you know, with -- when he said, if you had a

18  score below three, you're disqualified --

19      A      That's what he said.

20      Q      Do you know if he was referring to an aggregate or

21  a score from any one individual panelist, if you know?

22      A      I don't know.

23      Q      And just to confirm, you testified that, during

24  that initial debriefing session with him on the second day,

25  he didn't come out and tell you I gave you a two.

1  supposedly, all these documents all over the building stating

2  I'm doing GS-15 work, and then when the opportunity comes to

3  promote me, you didn't do it.  Explain to me -- yeah.  I

4  didn't understand it.

5     Q    Did you have debriefing sessions with either Mr.

6  Gillerman or Ms. Swineford?

7     A    No.

8     Q    Why didn't you reach out to either of them?

9     A    It was not their business.

10    Q    Why do you say that?  They were on the selection

11 panel, the interview panel, rather.

12    A    My filing discrimination against Chris was against

13 Chris and that was my business.  I was not filing any kind of

14 discrimination against Maria or Gordon.

15    Q    But why -- why didn't you go to, say, Mr. Gillerman

16 and say, hey, what happened, why didn't I get this job?

17    A    That was not the route -- I had no intention of

18 doing anything other than making sure I had the data and

19 making sure -- if I could not prove this, then I would not

20 have brought it forward, and asking for someone's opinion is

21 not proof.

22    Q    Have you, at any time, had a conversation with Mr.

23 Gillerman about -- about this case?

24    A    No, I haven't.

25    Q    Have you, at any point in time after the selection

1        Q     So, I understand that -- that you disagree with

2    these scores that Ms. Swineford assigned to you, correct?

3        A     Correct.

4        Q     Are you -- are you alleging that the scores that

5    Ms. Swineford gave to you are the result of discrimination?

6        A     I'm saying I disagree with her scores.

7              MR. SCHAEFER:   I'm sorry, Counsel.  Were you

8    objecting?

9              MS. QUINN:  No, I'm sorry.  No, I was not.

10             BY MR. SCHAEFER:

11       Q     So, is that -- I know you disagree with them, but

12   is this discrimination?

13       A     She didn't know me, so I don't know.  I did not

14   file the case against Maria.  I filed the case against Chris.

15   So, if she discriminated against me, I don't know.

16       Q     Okay.

17             So, now -- and so, she -- she graded Dr. Greene a

18   23, which is 4 points higher than the score she gave to you,

19   correct?

20       A     Correct.

21       Q     Okay.

22             Now, for the Tillery scores, Tillery gave a

23   combined score to you of 18, right?

24       A     Correct.

25       Q     And a score of 21 to Dr. Greene?

1       A    Correct.

2       Q    And those candidates are ranked -- sorted from --

3  in descending order from highest to lowest on the total

4  scores, right?

5       A    Correct.

6       Q    And do you see that Tillery scored Greene a 21?

7       A    Yes.

8       Q    And that's the -- the person that was ultimately

9  selected for the position, right?

10      A    Yes.

11      Q    And do you see that Tillery scored Higgins a 21?

12      A    Yes.

13      Q    And he scored -- scored you a 19, right?

14      A    Correct.

15      Q    Okay.

16           Does the fact that -- having seen this, does the

17  fact that Tillery scored Ms. Higgins a 21 -- does that change

18  your view that his score of you of 19 was discriminatory?

19      A    No.

20      Q    Why not?

21      A    Because he didn't hire Cathy; he hired Mark.  And

22  my concern is that I was the one that was the best qualified

23  for this position, above Cathy and above Mark, and the fact

24  that he hired Mark over me, he -- he discriminated.

25      Q    Well, Ms. Higgins is a female, correct?

Page 181

1        A     Yes.

2        Q     And you've testified that you don't know what her

3   age is, right?

4        A     Correct.

5        Q     Okay.

6              I'm going to ask you -- we can go to the document

7   in a moment if you want, but do you recall stating in your

8   responses to interrogatories in this case that you believe

9   that Gillerman has knowledge of Tillery's discriminatory

10  bias?

11       A     You will have to show me the document.

12             MR. SCHAEFER:  Sure.

13             Did we mark that one yet?  I think we did.

14             MR. COOLEY:  It's at the very end.

15             MS. QUINN:  It's 2, correct?

16             MR. SCHAEFER:  I'm looking for Plaintiff's

17  responses to Defendant's interrogatories.

18             MS. HUHTA:  Two, yes.

19             MR. SCHAEFER:  Exhibit 2.

20             BY MR. SCHAEFER:

21       Q     Okay.  Now, if you turn to interrogatory number 9,

22  which is on page --

23       A     -- 30?

24       Q     Yes, page 30.  And the question to -- to you -- the

25  interrogatory read, "Identify any individuals who you claim

1   to have witnessed or to have information regarding the

2   discrimination you allege that you suffered when you were not

3   selected for the supervisory program manager position and

4   describe in detail the information you contend that they have

5   and the date and circumstances in which they witnessed or

6   otherwise obtained this information," and then in your

7   response on number 6 for Gordon Gillerman, it says, "Mr.

8   Gillerman was on the review panel and likely has knowledge of

9   Mr. Tillery's discriminatory bias toward and preselection of

10  Mark Greene."  Do you see that?

11       A    Yes, I do.

12       Q    Okay.

13            What were you referring to when you say Gillerman

14  "has knowledge of . . . Tillery's discriminatory bias"?

15       A    Well, I said "likely has knowledge," because I

16  don't know that he does, but being on the panel, I suspect

17  that he -- and I'm speculating, so I'll try not to speculate.

18  I don't know that he has knowledge, but I suspect that he

19  does.

20       Q    And is there any --

21       A    He was there.  He experienced it.  He knows what

22  was said at the panel, and probably had discussions with

23  Chris, and so, he probably has some knowledge --

24       Q    And is there --

25       A    -- I'm not aware of.

Page 183

1      Q      Is there anything, aside from your speculation,

2      that you're thinking about when you say that he's likely to

3      have knowledge of discriminatory bias?

4      A      The fact that he did not recommend Mark Greene for

5      an interview, but Mark Greene ended up being selected for the

6      position, seems to me to be in contradiction.

7      Q      When you say he didn't -- he didn't recommend Mark

8      for an interview, who are you referring to?

9      A      Mr. Gillerman.

10     Q      Okay.

11            What are you referring to when you say that Mr.

12     Gillerman didn't recommend Mr. Greene for an interview?

13     A      Chris stated in his documentation that he had 77

14     applicants and he divided them up among the three panelists,

15     and each of the panelists went through them and made

16     recommendations on who they thought should be reviewed -- I'm

17     sorry -- interviewed, and Gordon did not recommend Mark to be

18     interviewed.

19            MR. SCHAEFER:  Hang on one second.  Okay.

20            BY MR. SCHAEFER:

21     Q      So, is it your -- is it your understanding that

22     Mark Greene's file was one of the ones that was assigned to

23     Mr. Gillerman to review?

24     A      Correct.

25     Q      In the initial screening process.

1       A    Of the 77.

2       Q    And -- and you're saying that Mr. Greene was not

3  one of the candidates that Mr. Gillerman recommended.

4       A    Correct.

5       Q    And tell me again, what's the significance of that?

6       A    It says here that I think he likely has knowledge

7  of Mr. Tillery's discrimination towards me and pre-selection

8  of Mark Greene, because Mr. Gillerman did not think that Mark

9  Greene was qualified to even make an interview, and yet, Mr.

10 Greene was the one that was selected for the position.  So,

11 there is some contradiction in that.

12      Q    Well, Mr. Gillerman himself scored Dr. Greene the

13 same as -- as you in the interview, right?

14      A    Correct.

15      Q    Does that not suggest to you that Mr. Gillerman

16 found that he was qualified for the position?

17           MS. QUINN:  Objection, calls for speculation.

18           THE WITNESS:  I don't believe that to be true.  I

19 don't think that he -- I don't know what Gordon was thinking

20 when he gave him those scores.

21           I believe, if you read his interrogatory, I believe

22 he said -- and I could be mistaken -- that he based his

23 scores based on Greene's resume, in addition to his

24 application, something like that.  That's the question you

25 asked me, right?

1   higher by four points than -- than she did you, right?

2        A    Yes.

3        Q    These are the explanations that she's provided in

4   her sworn answers to the interrogatories during the EEO

5   process.

6             You understand that, right?

7        A    Right.  After the fact, is what I realized.

8        Q    And can you think of any reason why Ms. Swineford

9   would be making up false reasons about the reason she

10  selected Dr. Greene?

11            MS. QUINN:  Objection.  That calls for speculation.

12            THE WITNESS:  I have to go back to -- she had

13  already had conversations with Chris, and that was my -- my

14  thought process, and you know, so she provided the

15  explanations to support her -- her -- her numbers.

16            BY MR. SCHAEFER:

17       Q    And --

18       A    I mean, those explanations came after the fact.  If

19  you look at the -- the interview notes, there's not enough

20  there to justify those numbers.

21       Q    So, are you saying that you think she's lying?

22       A    I think she's trying to support her numbers.

23       Q    Well, you're bringing a gender discrimination claim

24  in this case, right?

25       A    Yes, I am.

Page 194

1       Q     And this particular member of the panel is a

2    female, also, right?

3       A     Yes, she is.

4       Q     So, what -- what -- what reason would she have to

5    be discriminating against you?

6             MS. QUINN:  Objection.  Calls for speculation.

7             THE WITNESS:  I think that Chris already let her

8    know in some narrow form or fashion who he wanted to be the

9    selectee.  So, she made sure she scored him high and me

10   lower.

11            BY MR. SCHAEFER:

12      Q     One more final thing I want to ask you about here,

13   and that is basically what you're seeking -- what relief

14   you're seeking in this -- this lawsuit, and there are a

15   couple of different claims that you've made, and I want to

16   break those down a little bit, okay?

17      A     Okay.

18      Q     And in your -- in your complaint, you had stated

19   that you were seeking immediate promotion into the

20   supervisory program manager or equivalent GS-15 position at

21   the Step 10 position.  Do you recall that?

22      A     Yes.  That was in the very first package on the

23   discrimination.  Which -- which document --

24            MS. HUHTA:  You're talking about the lawsuit, the

25   complaint lawsuit?