# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DEBRA STOE,

     Plaintiff,

     v.

JEFFERSON B. SESSIONS III, in his
official capacity as Attorney General of the
United States,

     Defendant.[1]

Civil Action No. 16-1618 (JDB)

## MEMORANDUM OPINION

Plaintiff Debra Stoe, a scientist in the Department of Justice's ("DOJ") Office of Science and Technology ("OST"), was denied a promotion in 2014. Mark Greene, a younger man with less experience in the office, received the job instead. Thereafter, Stoe brought this lawsuit against the Attorney General in his official capacity as her employer (hereinafter "the government" or "OST"). Stoe alleges that OST's failure to promote her resulted from gender and age discrimination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("ADEA"). After a period of discovery, the government now moves for summary judgment, asserting that Stoe's failure to receive a promotion was due, not to discrimination, but simply to Greene being a better candidate for the position. The Court has reviewed the record evidence and, for the reasons explained below, will grant the government's motion.

---

[1] Jefferson B. Sessions has been substituted for Loretta E. Lynch as the Attorney General of the United States pursuant to Federal Rule of Civil Procedure 25(d).

# BACKGROUND[2]

Stoe has worked in DOJ's Office of Justice Programs ("OJP") since 1998. Pl.'s Ex. 16 [ECF No. 18-2] at 627–28.[3] In 2004, she received a position in OST, an office within the National Institute of Justice ("NIJ") in OJP. Def.'s Statement of Material Facts Not in Genuine Dispute ("Def.'s SMF") [ECF No. 16-2] ¶ 1. The position was graded at GS-14.[4] She has remained at the GS-14 level since, id. ¶ 3, and has been the only female scientist working in OST since 2010, see Pl.'s Ex. 8 ("Stoe Decl.") at 514 ¶ 4.

George "Chris" Tillery has been the GS-15[5] Director of OST since 2010. Def.'s SMF ¶ 6. That year, there was an opening for the GS-15 Operational Technology Division Director position, which supervises Stoe's GS-14 role. Pl.'s Ex. 35 at 784. Stoe was one of two finalists, but Tillery ultimately selected Davis Hart, a male candidate. Id. at 785, 789. In a memorandum to the director of NIJ, Tillery recommended Hart for the position over Stoe because Hart had more supervisory experience and hands-on experience relating to compliance testing and standards development. Id. at 788–89. However, Tillery noted that Stoe had a "more detailed and in-depth understanding of . . . managing NIJ's standards development and compliance-testing programs." Id. at 788. Tillery informed Stoe that he had not selected her for the Division Director position because she

---

[2] All facts stated in this opinion are undisputed unless otherwise noted.

[3] All citations to Stoe's exhibits refer to ECF No. 18-2. Since the exhibits appear in a single document, citations to those exhibits use the page numbers of the PDF, except for deposition transcripts, which use the page and line numbers of the relevant deposition.

[4] GS-14 is the fourteenth pay grade in the General Schedule pay scale, which is used to determine the salaries of most civilian government employees. See GS-14 Pay Scale – General Schedule 2014, FederalPay.org (last visited August 22, 2018), https://www.federalpay.org/gs/2014/GS-14. GS-14 is "generally reserved for top-level positions such as supervisors, high-level technical specialists, and top professionals holding advanced degrees." Id. Employees at the GS-14 level have "excelled in their field," and often supervise up to 100 people, although GS-14 also includes science, engineering, and research positions comparable to university professorships. Id.

[5] GS-15 is the fifteenth pay grade in the General Schedule pay scale. See GS-15 Pay Scale – General Schedule 2015, FederalPay.Org (last visited August 22, 2018), https://www.federalpay.org/gs/2014/GS-15. GS-15 is reserved for "high-level executive positions" and includes the government's "more renowned researchers." Id.

lacked supervisory experience; Ms. Stoe subsequently underwent formal supervisory training. Stoe Decl. at 514–15 ¶ 6.

Shortly after her rejection from the Division Director position, Stoe informed Tillery that she believed she was performing GS-15-level work in her GS-14 Physical Scientist role. Id. at 515 ¶ 7. After Tillery agreed but did not take action to rectify the pay grade discrepancy, Stoe raised the issue with Hart (then her first-line supervisor) in January 2011. Id. He agreed that she was performing GS-15-level work, and Stoe, Tillery, and Hart assembled a "desk audit" package to advocate for a re-classification of Stoe's position to GS-15. Id. ¶¶ 7–8. The desk audit explained that Stoe had "received 'exceeds expectations'" on her last two annual evaluations "as a GS-14 doing GS-15 work." Pl.'s Ex. 9–11 ("Desk Audit Request") at 531. Tillery recalled that, after the official submission of the desk audit in May 2012, then-NIJ director Dr. John Laub decided not to proceed with the audit because he believed that NIJ already had too many non-supervisory GS-15 employees. Def.'s SMF ¶ 11.[6] In 2013 or 2014, Tillery discussed the desk audit request with Laub's successor, Dr. Gregory Ridgeway. Id. ¶ 12. In connection with the request, Tillery spoke to the Human Resources Division, which gave him three options for Stoe's position: (1) create a new GS-15 position and place Stoe into it non-competitively; (2) create a new GS-15 position and allow Stoe and others to compete for it; or (3) remove the GS-15 duties from Stoe. Id. ¶ 13. Because Ridgeway also did not want to add non-supervisory GS-15 employees, he directed Tillery to take the third option and remove the GS-15 duties from Stoe's workload. Id. ¶ 15.

In March 2014, Hart left DOJ and the Division Director position re-opened. Def.'s SMF ¶ 16. Tillery updated the position description (now called "GS-15 Supervisory Program

---

[6] Stoe disputes that Laub made this decision. See Pl.'s Am. Statement of Genuine Issues ("Pl.'s SMF") [ECF No. 22-1] ¶¶ 11–12. However, she does not dispute that this is what Tillery recalled in his deposition and in a 2014 email regarding the desk audit. See Pl.'s Ex. 5 ("Tillery Dep.") at 52:18–22; Def.'s Ex. 8 [ECF No. 16-11] at 27.

Manager") before announcing the vacancy and accepting applications in April 2014. Id. ¶¶ 17–19. The updated description identified four equally-weighted groups of duties: supervisory and/or managerial responsibilities, program planning and management, business process analyses for program planning and management, and program advice and guidance. See Pl.'s Ex. 17 ("Position Description") at 630–33; Def.'s SMF ¶ 18. Tillery testified that some of these duties were GS-15-level work that Stoe had been performing, see Def.'s Ex. 5 [ECF No. 16-8] at 53:1–10; for example, Tillery added that the Division Director must "be one of the two alternate standards executives" on DOJ's Interagency Council on Standards Policy (ICSP), after he determined that it was a duty which had to be removed from Stoe's GS-14 role. Def.'s SMF ¶ 17. The vacancy announcement also identified five knowledge, skills, and abilities ("KSAs") required for the role: "(1) ability to develop and promote a diverse workforce; (2) ability to supervise; (3) ability to analyze organizational and operational problems and develop solutions; (4) knowledge of program management principles; and (5) ability to provide advice and guidance on business and program management issues." Def.'s SMF ¶ 20.

Tillery, the selecting official for the position, enlisted two other employees, Gordon Gillerman and Maria Swineford, to review applications and interview candidates on a panel with him. Id. ¶ 24. Tillery chose Gillerman, the manager of an organization within the National Institute of Standards and Technology, "because of his experience with standards." Id. ¶ 25. Swineford, the Deputy Director of the Grants Management Division of the OJP Office of Audit Assessment and Management, was asked to provide a "business processes perspective." Id. ¶ 26.

After reviewing all applications for the position, the Human Resources Division ("HR") sent Tillery four lists of "best qualified" candidates; none of the three finalists for the position (Stoe, Greene, and Kathleen Higgins) appeared on the lists. Id. ¶¶ 28–32; Pl.'s Ex. 14 at 546.

Tillery replied to HR expressing disappointment with the lists of candidates. Def.'s SMF ¶ 33. He specifically complained that many of the listed candidates had little or no experience in "conformity assessment (standards and testing)," which he wrote "bodes ill for their ability to replace [Stoe] as [DOJ's] alternate Standard's Executive." Def.'s Ex. 21 [ECF No. 16-24] at 1. In response to his concerns, HR generated an expanded list of "best qualified" applicants that included the three finalists. Def.'s SMF ¶ 36; Pl.'s SMF ¶ 36.

Tillery divided the applications among himself, Gillerman, and Swineford to determine who should be invited to interview. Def.'s SMF ¶ 40. Swineford, who was tasked with reviewing Stoe's application, initially recommended that the panel not interview Stoe. Id. ¶ 44. Swineford stated in her deposition that she did not recommend Stoe because Stoe's application did not demonstrate sufficient supervisory experience. Pl.'s Ex. 4 ("Swineford Dep.") at 36:5–12.[7] Gillerman reviewed Greene and did not recommend that he be interviewed based on his written application materials and résumé. Def.'s SMF ¶ 43; Pl.'s Ex. 1 ("Gillerman Dep.") at 110:16–111:3. After the panelists conferred, Plaintiff was selected for an interview despite Swineford's recommendation because her work "leading the standards activities within NIJ . . . justified or supported her leadership skills." Def.'s SMF ¶ 46 (citation omitted). Greene was also selected for an interview at that time because of a policy requiring that if one OJP employee is granted an interview all other OJP employees on the same HR list must be interviewed. Id. ¶ 47.

The panel interviewed finalists on July 11 and July 16, 2014. Id. ¶ 49. All candidates answered the same five questions, with some variations in follow-up. Id. Each panelist assigned

---

[7] At this time, Stoe had: completed eighty hours of Supervisory Management Training, Pl.'s Ex. 15 at 573; been the Acting Director of a DOJ program in 2002, id. at 564; and supervised other employees in developing standards in her role as Physical Scientist, id. at 558 ("Ms. Stoe[] . . . manag[es] and coordinat[es] multiple NIJ program managers at the GS-13 and GS-14 levels . . . .").

scores—calculated based on a score between one and five for each of the five questions—and shared them with the other panelists by email. Id. ¶¶ 50–52, 54, 56. Tillery scored Greene and Higgins highest, Swineford scored Greene highest, and Gillerman scored Stoe and Greene highest. Id. ¶ 59. After combining and averaging each candidate's scores, Greene finished with a final score of 21.33, Stoe with 19.00, and Higgins with 18.67. Id. Tillery selected Greene for the position over Stoe. Id. ¶ 60. In an email to Ridgeway on July 21, 2014, Tillery stated that although Stoe had a more detailed understanding of DOJ's standards strategy, Greene demonstrated a sufficient grasp on standards strategy and a more detailed understanding of the OJP grants process. Id. ¶ 61.

On August 22, 2014, Stoe contacted OJP's Equal Employment Opportunity Office. Answer [ECF No. 8] ¶ 15. She filed a formal EEO complaint on October 22, 2014. Id. After exhausting her administrative remedies, Stoe filed a complaint in this Court on August 10, 2016. Compl. [ECF No. 1] ¶ 15. The government moved for summary judgment on October 27, 2017. Def.'s. Mot. for Summ. J. [ECF No. 16]. That motion is now fully briefed and ripe for decision.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In determining whether there exists a genuine dispute of material fact sufficient to preclude summary judgment, the Court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The Court must deny summary

judgment if "reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." Id. at 252. However, summary judgment is warranted if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]," or if the evidence offered is "merely colorable" or "not significantly probative." Id. at 249–250.

## ANALYSIS

Stoe alleges that she was not promoted to Division Director in 2014 because Tillery discriminated against her based on her gender and age, in violation of Title VII and the ADEA. Title VII states that "[a]ll personnel actions affecting employees or applicants for employment . . . in executive agencies . . . shall be made free from any discrimination based on . . . sex . . . ." 42 U.S.C. § 2000e-16(a). Similarly, the ADEA states that "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . in executive agencies . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a).

As Stoe has not put forward direct evidence of gender or age discrimination, the Court must apply the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Johnson v. Perez, 823 F.3d 701, 706 (D.C. Cir. 2016).[8] Under this framework, the burden of production and order of presentation of evidence proceeds in three steps. First, the plaintiff must make a prima facie case of prohibited discrimination. See Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc). This done, the burden shifts to the employer to proffer a neutral, nondiscriminatory reason for taking the adverse employment action at issue. See id. If the employer proffers such a reason, the burden shifts once again to the plaintiff "to discredit the employer's explanation" and show that the employment action was, in fact, discriminatory. Id.

---

[8] While claims by federal employees are governed by different provisions of Title VII and the ADEA than are those of private employees, such claims "are analyzed in the same way as . . . claims against private employers." Johnson, 823 F.3d at 706 (Title VII); see Barnette v. Chertoff, 453 F.3d 513, 515 (D.C. Cir. 2006) (Title VII, ADEA).

While the burden of production shifts during these three steps, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

In this case, OST has provided a nondiscriminatory reason for failing to promote Stoe: it chose the new Division Director based on the applicants' interview scores, and Greene received the highest score. See Def.'s SMF ¶¶ 59–60. Therefore, the Court "need not—and should not—decide whether [Stoe] actually made out a prima facie case under McDonnell Douglas." Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008). Instead, the Court moves immediately to the final step of the McDonnell Douglas framework, in which Stoe must "demonstrate that the proffered reason was not the true reason for the employment decision"—a burden that "merges with the ultimate burden of persuading the [C]ourt that she has been the victim of intentional discrimination." Burdine, 450 U.S. at 256.

Because this case is before the Court on defendant's motion for summary judgment, rather than before a jury at trial, Stoe need not prove that her case is stronger than OST's to meet that burden. Rather, Stoe must "produce[] sufficient evidence for a reasonable jury to find that [OST's] asserted non-discriminatory reason was not the actual reason and that [OST] intentionally discriminated against [her] on the basis of . . . sex." Brady, 520 F.3d at 494. Stoe may do this either by providing affirmative evidence that a different motivation more likely underlay the decision or by attacking the credibility of OST's explanation (or both). See Burdine, 450 U.S. at 256. Hence, the Court must consider several types of evidence, including: (1) Stoe's prima facie case; (2) evidence attacking OST's explanation for not promoting her; and (3) "any further evidence of discrimination that may be available to [Stoe] (such as independent evidence of discriminatory statements or attitudes on the part of [Tillery]) or any contrary evidence that may

be available to [OST]." Aka, 156 F.3d at 1289. In this case, Stoe has proffered evidence of all three varieties. Therefore, the Court must consider each form of proof and "determine whether they 'either separately or in combination' provide sufficient evidence for a reasonable jury to infer" discrimination. Jones v. Bernanke, 557 F.3d 670, 679 (D.C. Cir. 2009) (citation omitted).

## I. STOE'S CASE

Stoe's evidence falls roughly into four buckets: (1) her prima facie case; (2) evidence about hers and Greene's relative qualifications; (3) evidence about the selection process itself; and (4) evidence regarding Tillery's prior behavior. The Court will examine each in turn.

### A. Prima Facie Case

While Stoe no longer needs to establish a prima facie case to proceed with her suit, the facts underlying that case remain relevant to her discrimination claims. To state a prima facie case of discrimination, a plaintiff must provide evidence that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002) (citation omitted). Stoe meets all three of these criteria. As a woman over the age of forty, Stoe is a member of a protected class under both Title VII and the ADEA. See 42 U.S.C. § 2000e-16(a); 29 U.S.C. § 633a(a). Stoe lost out on a promotion, and failure to promote constitutes an actionable adverse employment action. See Cones v. Shalala, 199 F.3d 512, 521 (D.C. Cir. 2000).

As for the third factor, Stoe has shown that "she was treated differently from [a] similarly situated employee[]" who is "not part of the protected class[es]." George v. Leavitt, 407 F.3d 405, 412 (D.C. Cir. 2005). Greene, a man under age forty, was promoted while she was not. Moreover, it is undisputed that the Division Director position was open and that Stoe was qualified for the job. See Def.'s SMF ¶¶ 19, 46. She therefore also has shown that OST's failure to promote her

"is not attributable to 'the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought.'" George, 407 F.3d at 412 (quoting Stella, 284 F.3d at 145). Stoe's prima facie case is relevant to the Court's determination, though it does not tell one all that much on its own.

### B. Qualifications Evidence

Perhaps Stoe's strongest evidence is the comparison of her qualifications with Greene's. Stoe's experience with significant aspects of the position for which she applied is highly relevant. "If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate"—which in turn allows the factfinder to assume that discrimination has entered the picture. Aka, 156 F.3d at 1294. However, "a plaintiff can directly challenge [a] qualifications-based explanation" for an adverse employment action "only if the plaintiff was 'significantly better qualified for the job' than those ultimately chosen." Adeyemi v. District of Columbia, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (quoting Holcomb v. Powell, 433 U.S. 889, 897 (D.C. Cir. 2006)). The word "significantly" means what it says. To defeat summary judgment, at least singlehandedly, "[t]he qualifications gap must be 'great enough to be inherently indicative of discrimination.'" Id. (citation omitted).

Neither party disputes that both Greene and Stoe had qualifications relevant to the position. At the time of the interview, they both were serving in GS-14 positions. Def.'s SMF ¶¶ 1, 3, 85. Stoe had been working at the GS-14 level since 2004, and Greene since 2012. Id. Stoe was a "Physical Scientist" while Greene was a "General Engineer." Id. ¶¶ 3, 85. Greene obtained a Ph.D. in materials science and engineering, had worked in the private sector, and had completed a postdoctoral fellowship at the National Institute of Standards and Technology. Id. ¶ 87. At NIJ,

Greene had led research into smart gun technologies and worked on, inter alia, technology and equipment performance standards. Id. ¶ 86. Stoe, meanwhile, estimates that she had published at least ten standards and had overseen the development of at least twenty standards and test methods at OST by 2014. Stoe Decl. at 515 ¶ 10. She had also worked substantially with OST's standards and testing and conformity assessment programs, worked with OST's compliance testing program, and served as DOJ's alternate member on the ICSP, among other things. See Desk Audit Request at 521–24.

Laying out these qualifications side by side, Stoe appears to have some advantage. She had eight more years' experience at the GS-14 level than Greene when they applied for the Divison Director position. At the time of the hiring decision at issue, Stoe had held a GS-14 position for ten years, while Greene had only been promoted to that level two years previously. She also had published a number of standards herself, and had moved beyond publishing standards to "supervis[ing]" a number of program managers as they directed the development of standards. Desk Audit Request at 521. Although Greene had worked on developing standards, there is no indication in the record that he had published any himself or had supervised others in developing them. Stoe also had supervisory experience (though not an official supervisory role), see id. at 521–24, and had received supervisory training after losing out on the Division Director position in 2010, see Stoe Decl. at 514–15 ¶ 6. Greene had received diversity training but not supervisory training, and he had not been a supervisor himself. See Pl.'s Ex. 2 ("Greene Dep.") at 70:17–71:2, 219:16–221:2. All of these factors point in Stoe's favor.

However, the difference in qualifications is not so stark as to permit an inference of discrimination. For one thing, Greene had a good deal of experience with grant-making and other business-related aspects of OST's work, which was weighted equally to program management in

importance for the position.  See Position Description at 631–32.  Relatedly, all three panelists gave Greene higher marks than Stoe for his interview response to the question related to "[a]bility to provide advice and guidance on business and program management issues."  Def.'s SMF at ¶ 50 n.4; see ¶¶ 53, 55, 57.  Greene also had a Ph.D., while Stoe did not.  Tillery wrote contemporaneously to Ridgeway that Greene won out due to "his detailed understanding of the OJP grants processes and their issues and his ability to provide guidance on technology policy," along with "a solid grasp" of OST's "standards strategy sufficient to the task."  Pl.'s Ex. 38 at 802.  The Division Director position simply had a different mix of duties than Stoe's position did.  Accordingly, OST reasonably could prefer someone with a balance of experiences other than Stoe's for the job.

Nor are Stoe's program management qualifications—impressive as they are—so far beyond Greene's as to permit an inference of discrimination under this Circuit's precedents.  In Aka, for instance, the court found that a jury reasonably could infer discrimination when the plaintiff—who was denied a pharmacy technician job—"had nineteen years of experience as a hospital assistant as well as bachelor's and master's degrees," while "the other applicant had no college education, had worked in the hospital laundry for slightly over a year, and had spent only two months as a pharmacy volunteer."  Holcomb, 433 F.3d at 897 (citing Aka, 156 F.3d at 1286, 1295–96).  Likewise, in Lathram v. Snow, 336 F.3d 1085 (D.C. Cir. 2003), the court "accepted an inference of discrimination where the plaintiff, who possessed several years' experience in public affairs, was 'substantially more qualified' than the unemployed former journalist who was hired for a higher position," Holcomb, 433 F.3d at 897 (quoting Lathram, 336 F.3d at 1092).  And in Calhoun v. Johnson, 632 F.3d 1259, 1262–63 (D.C. Cir. 2011), an inference of discrimination was reasonable when the official who was "at least formally the selecting official for the position"

contradicted the employer's nondiscriminatory rationale, stating in her deposition that the plaintiff was "far superior in three of" four job requirements—and "far superior overall"—to the selectee. Here, Stoe had much more experience in standards and conformity assessment than Greene, including at the GS-15 level. But the gap was not nearly as great as in Aka, Lathram, Calhoun, or other cases in which courts have found that a jury reasonably could infer discrimination from a comparison of qualifications alone.

There is, of course, the undeniable fact that Greene did not receive an interview based on the qualifications shown in his written application. Def.'s SMF ¶ 47. Instead, he only got an interview because Stoe did, since OJP policy required interviews for all certified OJP applicants whenever one employee reached that stage. Id. At first glance, this fact is perhaps the most damning piece of evidence Stoe has. Even here, however, the story is more complicated than Stoe claims it is. If it had been left to Stoe's initial reader, Swineford, Stoe would not have received an interview based on her application, either. Id. ¶ 44. Swineford believed that Stoe lacked supervisory experience and therefore was not a candidate for an interview. Id.[9] In fact, Greene had received a higher score than Stoe on his initial screening (18 versus 16), although Higgins had scored significantly higher than either of them (22). See Pl.'s Ex. 36 ("Mem. for Record") at 792. Tillery intervened, arguing in a conference call that Stoe's work coordinating standards development and representing OST on standards bodies showed that she had the requisite

---

[9] Stoe disputes this explanation, claiming that "Swineford did not recommend [Stoe] for an interview because Tillery had already signaled to her and Gillerman that he did not intend to select" her. Pl.'s SMF ¶ 44. However, the email to which Stoe points to support this argument does not create a genuine issue of fact, as no reasonable jury would make the inference from it that Stoe does. See Holcomb, 433 F.3d at 895. In the email, Tillery states that "the individual that is selected" for the position "will replace the member of our staff currently serving as one of the two alternate Standards Executives for DOJ." Pl.'s Ex. 34 at 782. The email does not name Stoe as the staff member in question, and there is no evidence that Swineford would have connected Tillery's statement to Stoe. Nor does the language suggest that Stoe would not be considered for Division Director. Indeed, even if Swineford had been under the impression that Tillery did not want Stoe considered for the position, and failed to recommend her for that reason, this impression was dispelled when Tillery later intervened to ensure that Stoe received an interview. Tillery's intervention also makes it hard to infer discrimination from Stoe's initial failure to qualify for an interview.

leadership skills.  Def.'s SMF ¶¶ 45–46; Tillery Dep. at 79:12–16.  Swineford edited Stoe's scores, and Stoe was then recommended for an interview.  Def.'s SMF ¶ 46.  It is therefore due to the actions of Tillery—whom Stoe principally tags as the discriminator—that Stoe was interviewed and thus even in the running for the Division Director job.

Nor does the fact that Stoe got her interview on the merits suffice to show that the ultimate choice of Greene was based on discrimination.  Even after Swineford raised Stoe's initial score, for instance, Stoe remained tied with Greene at 18.  See Def.'s Ex. 33 [ECF No. 16-37] at 3.  Greene was not considered an interview candidate based on one perceived deficiency: his application did not demonstrate "the requisite skills to serve as one of the two alternate DOJ Standards Executives."  Mem. for Record at 792–93.  Greene showed his mettle at the interview, however, "demonstrat[ing] a far greater understanding of conformity assessment and standards and testing than was indicated in his application package."  Id. at 793.  "An employer may of course select a candidate who on paper is less qualified for other reasons, such as subjective reactions that emerge in the interview."  Aka, 156 F.3d at 1294 n.10.  And here, the panel's rationale for reevaluating Greene did not rest on the sort of "'highly subjective' criteria, such as 'interpersonal skills,'" the "heavy use" of which render an employment decision suspect.  Id. at 1298 (citation omitted).  As the process used to select the Division Director was proper—for reasons explained below—Stoe's notable qualifications alone do not suffice for the Court to second-guess OST's decision.  See Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999) ("Title VII . . . does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions.'" (citation omitted)).

Beyond comparing her qualifications with the selectee's, a plaintiff "may seek to expose other flaws in the employer's explanation, including, inter alia, showing the employer has

misstated her qualifications." Holcomb, 433 F.3d at 897. Stoe does this, contending that she had "substantially more experience in grants management tha[n] Greene, and she demonstrated that experience in her interview." Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") [ECF No. 18] at 23. Stoe estimates that between 2004 and 2012 she distributed over thirty million dollars in the form of federal grant funding. Stoe Decl. at 516 ¶¶ 4, 12. In a performance plan from 2010, Hart and Tillery wrote that she "has done an outstanding job managing grants and portfolios" and "has had no late grant closeouts . . . or outstanding issues." Pl.'s Ex. 16 at 577. She ceased working with grants management in 2012 when her standards development program workload became too large to manage both responsibilities. See Pl.'s Ex. 26 at 732. At that time, some of her grants management duties were transferred to Greene. Id.

During the interview, Tillery wrote that Stoe was a "problem solver but not in the grants process area" and gave her a raw score of 2–3. Def.'s Ex. 34 [ECF No. 16-38] at 22. Tillery gave Greene a raw score of 3–5 for the same question, but did not add any notes to his interview rubric. Def.'s Ex. 35 [ECF No. 16-39] at 5. Gillerman gave Stoe a raw score of 4 on the question involving grants management, and gave Greene a raw score of 5 with the note "involved in tech [management] of complex grant[s]." Def.'s Ex. 37 [ECF No 16-41] at 138; Def.'s Ex. 38 [ECF No. 16-42] at 131. Swineford similarly rated Greene higher on the grants management question: she gave Stoe a raw score of 3 and gave Greene a raw score of 4. See Def.'s Ex. 40 [ECF No. 16-44] at 115; Def.'s Ex. 41 [ECF No. 16-45] at 83. Although Swineford testified that she "was impressed that [Ms. Stoe] was able to navigate a manual [grants] process" before the system was automated, Swineford Dep. at 256:21–257:1, Greene still received an average interview score higher than Stoe's based on his knowledge of the current, electronic grants management process. Thus, the evidence shows that the selecting officials did not "misstate[] her qualifications,"

Holcomb, 433 F.3d at 897; rather, they simply preferred Greene's more recent experience with complex grants.

Stoe's evidence of her relative qualifications, therefore, does not suffice for a reasonable jury to infer discrimination. True, she was in some ways more qualified on paper than was Greene to hold the position she was denied. But both were plainly well qualified. "Short of finding that the employer's stated reason was indeed a pretext, however—and here one must beware of using 20/20 hindsight—the court must respect the employer's unfettered discretion to choose among qualified candidates." Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996). And the qualifications gap is not wide enough to infer pretext. Stoe's evidence does, of course, remain relevant to the Court's ultimate decision.

### C. The Selection Process

Aside from the qualifications evidence, Stoe points to several aspects of the selection process itself that she claims illustrate that OST's proffered rationale is pretextual. But "discerning pretext is highly contextual," Ranowsky v. Nat'l R.R. Passenger Corp., No. 17-7062, 2018 WL 3894287, at *6 (D.C. Cir. Aug. 14, 2018), and many details of the process in fact undermine Stoe's discrimination claims.

#### 1. Intent to deny Stoe the position

To begin with, Stoe claims that "Tillery neither intended to select [her] for the position, nor gave her fair consideration." Pl.'s Opp'n at 33. Such evidence is highly relevant, as it would suggest "the selection process was geared not to finding the best person for the position, but rather to keeping [the plaintiff] from advancing." Salazar v. Wash. Metro. Transit Auth., 401 F.3d 504, 509 (D.C. Cir. 2005). Yet the Court cannot reasonably infer that the three documents Stoe puts forward to support this claim actually do so. Two of the three are emails—one to HR, the other to

Gillerman and Swineford—in which Tillery mentions that the Division Director chosen through the process would "replace" Stoe as NIJ's alternate member of the Standards Committee. Def.'s Ex. 21 at 1; Pl.'s Ex. 34 at 782. As Tillery mentioned in his email to HR, however, the Division Director would have to replace Stoe on the committee only because of "OJP's decision not to increase the grade of . . . Stoe's position"—despite the "request for a desk audit to increase the grade"—and instead "to strip that responsibility from [her]." Def.'s Ex. 21 at 1.

The record as a whole makes it irrational to infer from the word "replace" alone that Tillery sought to stymie Stoe's chances. Gillerman, for instance, did not read Tillery's email to the panelists this way, saying he "read this as the role of the alternate standards executive goes with this position." Def.'s Ex. 55 [ECF No. 21-5] at 104:1–20. Tillery also clearly articulated to another member of the Standards Committee during the application process that Stoe was up for the position, though he noted that "there is no guarantee that she will be selected." Pl.'s Ex. 38 at 823. And the adverse inference Stoe wishes the Court (and, presumably, a jury) to draw from the emails looks particularly unreasonable in light of Tillery's later intervention with Swineford to ensure that Stoe was fairly scored and thereby offered an interview. Def.'s SMF ¶ 46; Tillery Dep. at 79:12–16. It would be rather perverse for Tillery to make such an effort if he had meant to signal to the panelists that Stoe was not to be considered.

The third document Stoe puts forward is an email from Tillery to Ridgeway, sent after the interviews had been conducted but before any decision had been made. In that email, Tillery told Ridgeway: "We are done except for a final conference call on Monday. It[']s between Mark Greene and Kathy Higgins." Pl.'s Ex. 38 at 808. This email was not sent to Gillerman or Swineford, see id., and was sent two days before Tillery sent around his interview scores and five days before the other panelists sent around theirs, see id. at 803–08. In fact, it was after sending

the email to Ridgeway that Tillery suggested averaging the three panelists' scores to come up with a consensus choice—rather than, say, having Tillery unilaterally make the pick. Id. at 805. The context in which it was sent, then, clarifies that Tillery was likely referring to his own scores, which had Greene and Higgins tied, see Def.'s SMF ¶ 53, perhaps under the assumption that the other panelists felt the same way as he did about the interviews. Most importantly, neither this statement nor the others to which Stoe points can create a reasonable inference of gender or age discrimination; they could suggest at most an intent to bar one individual from consideration. This is particularly so given that Tillery treated Higgins—a woman older than Stoe—as an ideal candidate and rated her as tied with Greene for the job. See Part II.A, infra.

2. Alleged infirmities with the interview process

Next, Stoe attacks on several fronts the interview process itself. She claims, for instance, that the interviews varied in length in a manner that disadvantaged her. See Pl.'s Opp'n at 44. But there is no credible evidence of this. Stoe said of her interview: "I think it was a little short." Pl.'s Ex. 3 ("Stoe Dep.") at 103:13. There is no evidence that her interview actually lasted less than the allotted thirty minutes. Nor did Greene's statement that his interview had lasted "[t]o the best of [his] recollection, not longer than an hour," indicate that his interview in fact lasted an hour or was appreciably longer than Stoe's. Greene Dep. at 149:15–16. And while Stoe claims that Greene was asked follow-up questions while she was not, Pl.'s Opp'n at 44, Greene could not remember whether he was asked any follow-up questions, Greene Dep. at 152:4–10, while Tillery believed that he had asked follow-up "questions that . . . would have allowed Ms. Stoe to elaborate on specific experience in regard to the interview questions," Def.'s Ex. 54 [ECF No. 21-4] at 98:5–8. Even reading this evidence in the light most favorable to Stoe, natural variations in interview length that result from the applicants' answers and the follow-up questions such answers may generate

do not support a finding of discrimination. If they did, it would be a rare hiring process that could not be challenged.

Stoe also finds fault with the fact that the interview questions "were worded to ask for one single example" rather than asking "about overall background and experience." Pl.'s Opp'n at 43. But employers must have the leeway to structure their interview questions in the way they feel will give them the substantive information needed to make a decision. There is no evidence that the questions as framed favored one candidate over others. "[T]he key question in this context 'is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers.'" Hairston v. Vance-Cooks, 773 F.3d 266, 273 (D.C. Cir. 2014) (citation omitted). There is no evidence here that Tillery did not honestly believe that asking the questions in terms of seeking specific examples—a common interview technique—was the best way to conduct the interview. And the questions were clearly performance-based rather than subjective, as they focused on each of the five KSAs for the Division Director position. See Thompson v. McDonald, 169 F. Supp. 3d 170, 187 (D.D.C. 2016). Indeed, Stoe herself testified that "the interview questions were appropriate for the position," and that "the questions themselves were appropriate for the interview." Stoe Dep. at 102:1–2, 102:17–18.

Stoe's third complaint about the interview was that Tillery chose to ask a question about grants management, and include Swineford on the panel, "when he knew that grants management was being phased out of the Division Director's responsibilities." Pl.'s Opp'n at 43. She claims that this suggests pretext because Greene's superior scores on the grants question helped lead to his selection. Id. Yet there is no credible evidence that Tillery planned to remove grants management from the Division Director in 2014. Until late 2015, grants management and standards development both remained within the Policy, Standards, and Grants Management

Division.  Def.'s SMF ¶ 7.  OST's 2013 reorganization "consolidated" grants management in this division.  Pl.'s Ex. 21 at 713; <u>see</u> Pl.'s Ex. 22 at 718.  The Division Director was placed in charge of both the division's scientists and its grants management specialists.  Pl.'s Ex. 37 at 795.  The position description for the vacancy in 2014 therefore stated that the Division Director was in charge of OST's grants management process.  Def.'s SMF ¶ 17.  Stoe does not dispute that grants management was removed from the position's purview sometime after the hiring decision at issue took place.  <u>See</u> Pl.'s SMF ¶ 7.  Indeed, all of the evidence suggests that grants management formed a significant portion of the Division Director's duties, until a second reorganization in August 2015 moved those duties to another office.  <u>See</u> Def.'s Ex. 53 [ECF No. 21-3] at 1, 13 (laying out new organizational chart approved August 3, 2015); Def.'s Ex. 57 [ECF No. 21-7] at 253:16–254:20 (Greene noting that he spent "at least 50 percent of [his] time if not more" on grants management in his first year as Division Director); Swineford Dep. at 228:3–229:21.  Grants management was therefore an important topic for an interview question.  And although the removal of these duties was at least contemplated in 2014, Tillery stated that "at the time of the hiring action, it wasn't a done deal" that this reorganization would occur, and he "couldn't plan for it to be a done deal."  Def.'s Ex. 54 at 256:1–3.  Hence, it was perfectly reasonable to ask about grants management and the existence of that question does not imply pretext.

The last of Stoe's interview-related concerns is her perception that Tillery shook his head as she was responding to a question, which Stoe says "could reasonably be interpreted as signaling to the other panelists that he had no intention of selecting" her.  Pl.'s Opp'n at 41.  The available evidence is that neither Swineford nor Gillerman noticed this behavior—and, if they did, that it did not influence them.  <u>See</u> Def.'s Ex. 55 at 268:7–14, 268:21–269:7; Def.'s Ex. 56 [ECF No. 21-6] at 264:3–7.  Even assuming that Tillery did shake his head, and that the other panelists saw it,

a reasonable jury could not infer discriminatory intent from that action. There is no evidence that any head-shaking was connected to a desire to torpedo older or female applicants, or that he engaged in this activity during the interviews of any of the other such applicants. Other than her concern about the head-shaking, which was not discriminatory, Stoe testified that she "think[s] the interview was appropriate." Stoe Dep. at 103:12. The evidence backs up that assessment.[10]

### 3. Interview as basis for selection

In addition to the alleged irregularities in the interview process, Stoe challenges as overly subjective—and hence discriminatory—the decision to use the interview as the sole basis for selecting the Division Director. See Pl.'s Opp'n at 34–36.[11] It is true that "[t]he assessment of interview performance is inherently subjective." McIntyre v. Peters, 460 F. Supp. 2d 125, 137. (D.D.C. 2006). This by itself, however, does not create an inference of discrimination. "Selecting a pool of qualified candidates based upon their written credentials and then making a final selection based upon personal interviews is an obviously reasonable method of hiring a professional employee." Fischbach, 86 F.3d at 1183–84.

Stoe nevertheless argues that the use of interview scores to make a final selection was discriminatory in this instance. In particular, she asserts that such heavy reliance on interviews is fishy since "Greene's written application materials showed he wasn't sufficiently qualified." Pl.'s Opp'n at 35. However, Greene made the certification list of the "best qualified" applicants, Def.'s SMF ¶¶ 35–36; Def.'s Ex. 24 [ECF No. 16-28] at 3, which establishes that he was qualified for

---

[10] Stoe also claims that Tillery awarded Greene the same score as Higgins, despite admitting in his deposition that Stoe had outperformed Higgins—and therefore, by inference, had outperformed Greene. See Pl.'s Opp'n at 36. However, Tillery did not say that Stoe had done better than Higgins overall; rather, he said that Stoe performed better in terms of her presentation and communications skills, while Higgins performed better in terms of the substance of her answers. See Pl.'s Tillery Dep. at 130:21–132:11. It is not suspect to choose substance over style when deciding who to hire for a policymaking position.

[11] Tillery initially suggested using an average of the panelists' interview scores to select the winner. See Pl.'s Ex. 38 at 807. He also said, however, that he was "[m]ore than willing to entertain alternate approaches." Id. Neither of the other panelists objected to the proposed approach or suggested a different one.

the position. Although it was an OJP policy rather than his application alone that led Greene to receive an interview, Stoe does not challenge that policy as discriminatory. Nor does the fact that Gillerman did not initially consider Greene worthy of an interview render the use of interview scores suspect. The interviews did not focus on "'highly subjective' criteria, such as 'interpersonal skills,'" Aka, 156 F.3d at 1298 (citation omitted); the interview questions were instead focused on the substantive skills necessary for the job, see Fischbach, 86 F.3d at 1184; Pl.'s Ex. 38 at 814–18. The panelists also provided a reasonable, nondiscriminatory rationale for why they revised their opinions of Greene in light of the interview: he proved to have a greater understanding of standards than his résumé suggested. See Mem. for Record at 793.[12] The fact that they relied on interview scores to fill the post, then, is not evidence of pretext.

Stoe also claims that the decision to use only interview scores departed from OST's normal selection procedures, because Tillery appeared to base his selection procedure for Division Director in 2010 solely on qualifications. See Pl.'s Opp'n at 35. Generally, "departure from internal hiring procedures is a factor that the trier of fact may deem probative." Johnson v. Lehman, 679 F.2d 918, 922 (D.C. Cir. 1982). However, the disparity between 2010 and 2014 is not probative here. Tillery appears not to have interviewed in 2010 at all, perhaps because HR recommended only two potential candidates for the position (Stoe and Hart). See Pl.'s Ex. 35 at 785–89. It is inaccurate to call this single distinguishable example a "policy" from which Tillery later departed. OJP's written merit promotion policy, meanwhile, provides no particular procedure or metric for making a final candidate selection. See Def.'s Ex. 49 [ECF No. 16-53] at 351. It

_____

[12] Stoe asserts that Tillery "referred to Greene's 'background' and not to his actual interview performance" in the memorandum explaining the panel's choice. Pl.'s Opp'n at 35. That is not the case. As part of a paragraph explaining why the interview changed the panel's assessment of Greene, Tillery stated that, "during the interview," Greene "demonstrated a stronger background in grants management than did" Stoe. Mem. for Record at 793. It is too clear for argument what Tillery's words meant: Greene's interview performance brought out evidence of his qualifications that was not apparent in his written application. This is a perfectly acceptable rationale for making a hiring decision.

presumes that interviews will be conducted; but beyond that, it states only that any selectee chosen from those ranked under the merit selection procedures must be one of the candidates "who have been identified as best qualified." Id. The interviewees here were selected only from the "best qualified" group of applicants. See Def.'s SMF ¶¶ 35–36, 38.

While the panel's use of interview scores to make its final selection is not evidence of pretext, the scoring itself points strongly against a finding of discrimination. Tillery, at whom Stoe primarily directs her discrimination claims, rated an older woman (Higgins) as tied for first with Greene, a result that hardly suggests discriminatory purpose. See Def.'s SMF ¶ 59. Moreover, taking the alleged discriminator out of the picture would not change the result. If the panel had consisted solely of Swineford and Gillerman, Greene would have beaten out Stoe by an average score of 21.5 to 19.5, a 2-point gap barely any smaller than the 2.33-point disparity when all three panelists' scores are included. Id. Indeed, no panelist scored Stoe highest: Gillerman had her tied with Greene, while Swineford scored Greene a full four points higher than Stoe. Id.

In conclusory fashion, Stoe disputes the "legitimacy" of this scoring. Pl.'s SMF ¶ 59. However, as the evidence does not show that Tillery influenced the other panelists or that the interview process itself was discriminatory, there is no genuine dispute that the panelists' scores are legitimate. The Court finds that "the presence of the other panelists and the near parity between their scoring and [Tillery's] scoring weakens"—considerably—"the likelihood that a jury could find pretext." Salazar, 401 F.3d at 512 (citation omitted).

### 4. Alleged shifting explanations

Stoe also alleges that Tillery tipped his discriminatory hand in conversations he had with Stoe after Greene was selected, providing Stoe with shifting explanations as to why she had not gotten the job. See Pl.'s Opp'n at 42. Stoe claimed in her declaration that Tillery first informed

her on July 23, 2014, two days after the selection, that she was not the choice.  See Stoe Decl. at 516 ¶ 13.  According to Stoe, Tillery had told her that she scored highest on four of five questions, but scored second on the grants question.  Id.  Questioning how this mathematically could lead to her losing out on the job, Stoe followed up with Tillery the next day; Tillery "responded that a candidate would not be selected if they had scored lower than a '3' on any of the interview questions."  Id.  As Stoe later found out, Tillery had given her a 2 on her grants management answer.  Id.

A factfinder may infer discrimination from "'changes and inconsistencies' in the employer's given reasons for the decision," since "it is often reasonable to think that an employer who lies or obviously bluffs about or shifts its rationale for challenged action is culpable of the charged discrimination."  Allen v. Johnson, 795 F.3d 34, 40 (D.C. Cir. 2015) (citation omitted); see Ranowsky, 2018 WL 3894287, at *5–6.  "However, refinement of a previously proffered explanation does not rise to the level of a shifting-rationale, and is insufficient to demonstrate pretext."  Ajisefinni v. KPMG LLP, 17 F. Supp. 3d 28, 42 (D.D.C. 2014) (collecting cases).  Here, the only contemporaneous evidence of these conversations is an email Stoe sent to Hart on July 23, 2014, which did not include any of the details Stoe included in her declaration several years later.  See Def.'s Ex. 60 [ECF No. 21-10] at -889 ("Just wanted to be the one to let you know that I did not get the job.  Not sure who did but Chris informed me that I came in second and was beat out by someone with more experience with grants.").

Accepting Stoe's later version of events, however, it remains clear that Tillery gave Stoe the same essential reason why she was not chosen that he and the other panelists gave in their Memorandum of Record: Greene performed better in the interview than she did on grants management issues.  The scores given to the two applicants on the grants question bear out this

explanation: all three panelists scored Stoe lower than Greene on the grants question, and Tillery scored her a full three points lower. Def.'s SMF ¶¶ 53, 55, 57. Different iterations of the same "overarching rationale" do not render Tillery's explanations "inconsistent" with OST's proffered nondiscriminatory rationale. Montgomery v. Gotbaum, 920 F. Supp. 2d 73, 81 (D.D.C. 2013), aff'd, No. 13-5107, 2013 WL 5610248 (D.C. Cir. Sept. 10, 2013). To the extent that Tillery's explanations are "inconsistent" with the full scoring that led to Greene's selection, "any such inconsistencies are 'so minor that no reasonable jury could find that [Tillery's] proffered reasons are a pretext for discrimination.'" Id. at 82 (citations omitted).

### D. Tillery's Prior Behavior

Finally, Stoe presents several pieces of independent evidence meant to show that Tillery harbors bias against female employees. None is more than marginally helpful to Stoe's case. Hence, this evidence is not sufficient for a reasonable jury to conclude that OST discriminated against Stoe.

First, Stoe puts forward a declaration from her office-mate and fellow NIJ employee, Christine Crossland. See Pl.'s Ex. 7 ("Crossland Decl."). Crossland, who does not work in OST but who has "personally observed many conversations and interactions between" Tillery and Stoe, id. at 509 ¶¶ 4–5, asserts that Tillery "has created and promotes a male-dominated workplace culture that is hostile to women," id. at 510 ¶ 6. Stoe makes similar allegations in her own declaration. See Stoe Decl. at 517 ¶ 15. Stoe argues that these statements are "highly probative, and raise[] an inference that Tillery's gender bias infected the 2014 selection." Pl.'s Opp'n at 39. The government urges the Court to discount Crossland's declaration entirely, and asserts that neither woman's allegations of gender bias aid Stoe at all. See Reply in Supp. of Def.'s Mot. ("Reply") [ECF No. 21] at 21–22. As is often the case, the truth is somewhere in the middle.

Generally, "affidavits containing nothing more than unsubstantiated rumors, conclusory allegations, and subjective beliefs are wholly insufficient to establish an inference of discrimination." Glass v. Lahood, 786 F. Supp. 2d 189, 218 (D.D.C. 2011), aff'd, No. 11-5144, 2011 WL 6759550 (D.C. Cir. Dec. 8, 2011). This standard in mind, the government compares Stoe's evidence to affidavits in other cases that accused supervisors of exhibiting racist attitudes without supporting details. See Reply at 22–23 (first citing Bruder v. Moniz, 51 F. Supp. 3d 177, 197 (D.D.C. 2014); and then citing Johnson v. DiMario, 14 F. Supp. 2d 107, 109–10 (D.D.C. 1998)). But unlike those examples, Stoe and Crossland's declarations do not consist only of "conclusory speculation devoid of any factual foundation." Bruder, 51 F. Supp. 3d at 197 (citation omitted).

Crossland states that Tillery "frequently speaks to [Stoe] as if he thinks she does not know what she is talking about—even though she clearly does"; that she has "heard [Tillery] interrupt, undermine, and insult [Stoe] in meetings"; and that she has "never observed [Tillery] speak to a male colleague in the dismissive way he frequently speaks to [Stoe]." Crossland Decl. at 510 ¶ 8. She also alleges that Tillery told OST staffers "to ignore [Crossland's] guidance" on a project related to her "area of expertise," and that Tillery responded to Crossland's complaints to management by complaining to Crossland's supervisor about her "interference." Id. at 510–11 ¶¶ 10–11. Similarly, Stoe says that "[o]ver the years, . . . Tillery has interrupted [her] while speaking, refused to let [her] finish speaking, challenged [her] authority and belittled [her] in front of male colleagues, [and] become angry when [she has] corrected a mistake or incorrect statement that he made." Stoe Decl. at 517 ¶ 16. According to Stoe, Tillery also "sometimes rephrase[d] what [she] had said a moment prior, as a way of taking credit for [her] ideas, or suggesting that [she] had been inarticulate and that he needed to translate." Id. Meanwhile, Tillery "is respectful,

deferential, and complimentary" to Stoe's male colleagues.  Id.  Both women also assert that, while Tillery has not promoted Stoe since she began working at OST, he has promoted a number of men in the office.  See Crossland Decl. at 511 ¶¶ 12–13; Stoe Decl. at 514 ¶ 5.

This information is more than unsubstantiated, subjective conclusions.  The sort of soft sexism alleged in these declarations, practiced over a period of years, is no less pernicious than the overt kind.  And the Court must assume the allegations to be true at this stage.  However, Stoe has not brought a hostile work environment claim; she is complaining about a particular failure to promote her.  As discussed above, Tillery was not the sole decision-maker in the 2014 hiring process, and there is no material evidence that gender or age bias infected the other selecting officials or the decision as a whole.  In the end, the declarations do not provide the sort of details that would show that the allegations they contain are "closely related . . . to [Stoe's] circumstances and theory of the case."  Glass, 786 F. Supp. 2d at 218 (citation omitted).  Their relevance, therefore, is rather limited.

Second, Stoe asserts that "Tillery's gender bias was further evident when he declined to appoint [her] as the Acting Division Director" after Hart left the position in 2014.  Pl.'s Opp'n at 40.[13]  There is little to this claim.  After Hart resigned, Tillery briefly considered appointing one of the four GS-14 scientists in the office in "a 120-day rotation" as an acting director.  Tillery Dep.

_____

[13] The government mistakenly believed that Stoe was referring to Tillery's decision not to promote her to Division Director back in 2010.  See Reply at 23.  Though this is not the case, a brief word on the 2010 promotion is in order.  As the government points out, Stoe never challenged this decision as discriminatory and it is now time-barred, see Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002), so it was not a major focus of discovery, see Reply at 23.  Still, the facts of the 2010 promotion decision can act "as background evidence" regarding the 2014 promotion claim.  Morgan, 536 U.S. at 113.  Stoe does not directly assert in her opposition brief that the 2010 decision provides such evidence.  She argues only that her 2010 rejection for lack of supervisory experience makes the decision to hire Greene in 2014—when he admitted not to have had supervisory experience or training at DOJ—look suspect.  See Pl.'s Opp'n at 43.  And this juxtaposition does appear rather odd.  The hiring panel was impressed by Greene's responses to the interview questions on ability to supervise, however, see Def.'s SMF at 12 n.4, ¶¶ 53, 55, 57; and in any event there is too much evidence on the government's side regarding the 2014 promotion process itself for the 2010 promotion decision to alter the outcome, see Law v. Cont'l Airlines Corp., 399 F.3d 330, 334 (D.C. Cir. 2005).

at 41:3–8.  Under questioning from Stoe's counsel, Tillery admitted that Stoe "was the most familiar with the division" of the four GS-14s at the time and was "probably . . . senior in grade." Id. at 45:18–46:3.  Indeed, after Stoe first expressed interest, Tillery began the process of determining how to appoint her to the acting position.  See Pl.'s Ex. 38 at 825.  However, to his surprise, all four GS-14s ended up expressing interest in the acting director position.  Tillery Dep. at 45:6–7.  Because OST might hire a new permanent Division Director within the first 120-day period—thereby depriving all but one of the interested employees of a chance to serve as acting director—Tillery determined that it was "fair" for him to assume the acting director position himself, in addition to his role as head of OST, until a permanent replacement was found.  Id. at 41:18–22.  There is nothing unreasonable—or discriminatory—about that decision.  Contrary to Stoe's implication, see Pl.'s Opp'n at 40, then, deciding to keep the peace amongst one's subordinates by not choosing between them for what was, in any event, only a temporary promotion is not evidence of discriminatory bias.

Third, Crossland and Stoe point out that Stoe has long been "the only female scientist at OST." Stoe Decl. at 514 ¶ 4; Crossland Decl. at 510 ¶ 7.  Allegations that members of a protected class are underrepresented in an employer's workforce are "relevant" to individual disparate treatment, but are "less significant" than in pattern or practice cases because general statistics are less probative of intent as to a particular employment decision.  Krodel v. Young, 748 F.2d 701, 710 (D.C. Cir. 1984). Information regarding the demographic breakdowns of a workplace is rarely taken into account without a showing of statistical significance, usually provided by an expert. See, e.g., Thomas v. Chao, 65 F. App'x 321, 324 (D.C. Cir. 2003) (unpublished); Horvath v. Thompson, 329 F. Supp. 2d 1, 11 (D.D.C. 2004).  Stoe has not made such a showing here. Allegations of underrepresentation can still be probative of discrimination in "circumstances that

are so straightforward or striking that a reasonable jury could find on its own that any underrepresentation was statistically significant." Dyer v. McCormick & Schmick's Seafood Rests., Inc., 264 F. Supp. 3d 208, 233 (D.D.C. 2017). Being the sole member of a protected class in a workplace may fit that bill. However, that fact alone cannot provide probative evidence of pretext without additional information—such as the number of scientists at OST[14] and the demographics of the pool of applicants for OST scientist positions—that would place Stoe's position as the sole female OST scientist in its proper context. See Frazier v. Consol. Rail Corp., 851 F.2d 1447, 1454 (D.C. Cir. 1988); Horvath, 329 F. Supp. 2d at 11.[15]

Stoe's role as the sole female scientist at OST, as well as her other evidence of Tillery's alleged preexisting bias, is relevant to her claim of gender discrimination. But at best it is weakly

---

[14] The only available evidence in the record suggests that during the time period at issue, OST had a staff of fifteen, fewer than ten of whom were scientists. See Pl.'s Ex. 37 at 795.

[15] Stoe also puts forward evidence that she claims shows that Tillery "slow-walked the preparation of a formal request for a desk audit" in 2011–2012, and continued to make empty promises to Stoe about regrading her position as a GS-15 even after he knew this would not happen. Pl.'s Opp'n at 13. But Stoe never argues in her opposition to the government's summary judgment motion that this evidence supports a finding of discrimination; the desk audit information appears only in the facts section of her opposition brief. Id. And in any event, the underlying evidence does not create any significant background evidence of discriminatory intent—if anything, it helps the government's case. Stoe claims that she first discussed the grading of her duties with Tillery and Hart two years before they filed the desk audit, see Stoe Dep. at 22:4–9, a claim which formed the basis for Stoe's later "slow-walking" allegation, see Pl.'s Opp'n at 12–13. However, Stoe also acknowledges that some of this time was taken up with her drafting, and Hart and Tillery editing, the desk audit package, including the description of what Stoe's GS-15 position would be. See Stoe Dep. at 26:21–27:20. While Stoe thought these rewrites were "unnecessary," she did not otherwise provide any basis for inferring that Tillery was purposely delaying the desk audit. Def.'s Ex. 1 [ECF No. 16-4] at 60:3–25. Hart likewise stated that Tillery made such edits because "[h]e wanted to make sure that the wording was correct, that we met the standards, that a desk audit would come back with a positive resolute, that we wanted to get her promoted." Def.'s Ex. 58 [ECF No. 21-8] at 116:12–15. Tillery "fought very hard for this desk audit. He wanted to promote her to GS-15." Id. at 116:6–7.

Stoe also noted that Tillery was working on a reorganization of the office at the same time. Stoe Dep. at 27:21–24. As Stoe acknowledged, Tillery revisited her desk audit with Ridgeway in 2013 and/or 2014, at her request. See Def.'s Ex. 1 at 53:9–18. Tillery did this by attempting to fold Stoe's promotion to GS-15 into the reorganization of OST. See Def.'s Ex. 8 at -27 to -28. In March 2014, after Hart had left OST, Tillery recommended to Ridgeway that Stoe's position be regraded to GS-15, because the proposed reorganization split up Hart's division into "a Standards and Testing Team led by notionally [Stoe] and a Grants Management Team" led by a potential GS-14 supervisor. Id. at -27. Because the plan eliminated Hart's position, Stoe could be promoted without adding to the number of GS-15 positions in OST, id., which had been Laub and Ridgeway's main concern. Tillery noted that Ridgeway "has the authority to create the new position and move [Stoe] into it," or that the position could otherwise be advertised for "5 or 10 days." Id. In the end, Ridgeway—not Tillery—settled on the competitive process about which Stoe now brings suit. See Def.'s Ex. 9 [ECF No. 16-12].

so. And Stoe provides no evidence of any prior age discrimination on Tillery's part. The independent evidence Stoe puts forward is therefore insufficient to cause a reasonable jury to infer discrimination here.

## II. DEFENDANT'S ADDITIONAL ARGUMENTS

In addition to the evidence it has put forward to rebut Stoe's affirmative case, the government also makes two arguments of its own: that Tillery's favoritism toward Higgins shows he did not discriminate, and that any inference of discrimination is undercut by the fact that Tillery and Swineford shared protected characteristics with Stoe. The first of these arguments helps the government's case still more, while the latter factors minimally, at most, into the Court's decision.

### A. Tillery's Support for Higgins

The government first claims that Tillery favored Higgins, another woman who was older than Stoe, and that his decision to give Higgins the same interview score as Greene "'seriously undermines' [Stoe's] claim that Tillery's decision not to select [Stoe] was discriminatory." Def.'s Mem. at 24. While the government overstates the importance of this evidence, it does cut mildly against Stoe's claims. As the government acknowledges, see id., in the paradigmatic case in which such evidence matters it is the actual selectee who shares the plaintiff's protected characteristics, rather than merely a finalist for the position, see, e.g., Murray v. Gilmore, 406 F.3d 708, 715 (D.C. Cir. 2005); Montgomery v. Gotbaum, 920 F. Supp. 2d 73, 84 n.8 (D.D.C. 2013). The government does cite one case in which a court drew a negative inference from the fact that another member of the plaintiff's protected class was deemed among the best qualified for the position and was rated higher than the plaintiff. See Walker v. Dalton, 94 F. Supp. 2d 8, 16 (D.D.C. 2000). Even there, however, both the initial screening official and the selection panel rated that similarly situated candidate more highly than the plaintiff, id.—whereas here, Tillery was the only one of

the three members of the selection panel who rated Higgins higher than Stoe, Def.'s SMF ¶ 59. Thus, while Tillery's high score for Higgins does tend to negate Stoe's assertion that Tillery discriminated against her, it does not cut as strongly against Stoe as the government suggests.

More helpful for the government's case is Tillery's request to expand the pool of candidates for Division Director after the initial certified list proved unsatisfactory. In his email making the request, Tillery noted that a candidate with "no experience in conformity assessment" or technology policy, and with "minimal" grant management experience, scored highly enough to be certified. See Def.'s Ex. 21 at 1. Tillery lamented that Higgins, by contrast, had not been certified, despite being "an almost ideal candidate from the perspective of conformity assessment and technology policy," whose experience managing a $50 million grant program "suggests a high degree of business acumen." Id. at 1–2. Tillery asked: "Can I get Ms. Higgins in front of the panel for consideration, without having to go through two rounds of review?" Id. at 2. He further queried whether he could lengthen the list of certifications, or else work with the inactive certification list, so that Higgins could be interviewed—and if he could do so without having to consider all of the many other applicants that the existing system had ranked ahead of her. See id. That Tillery went so far out of his way to ensure consideration for Higgins, who is a woman six years older than Stoe, see Def.'s SMF at 8 n.2, suggests that Tillery was solicitous of at least some female, older applicants. Likewise, Tillery only recommended two applicants for interviews among those he screened, both of them female: Higgins and Oksana Pozda. Def.'s SMF ¶ 42. While not dispositive, this evidence certainly points away from a finding of discrimination.

### B. Decision-Makers Sharing Stoe's Characteristics

The government also argues that "any discriminatory inference is . . . weakened by the fact that" Tillery "is approximately the same age as" Stoe and Swineford is "the same sex." Def.'s

Mem. at 25. The Supreme Court and the D.C. Circuit have hinted—but have not held outright—that the fact that a selector shares a relevant protected characteristic with a plaintiff might weigh against a finding of discrimination. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 513–14 (1993); Aka, 156 F.3d at 1291. Several judges in this district, including the undersigned, have previously said as much directly. See, e.g., Ranowsky v. Nat'l R.R. Passenger Corp., 244 F. Supp. 3d 138, 144 (D.D.C. 2017), aff'd on other grounds, No. 17-7062, 2018 WL 3894287 (D.C. Cir. Aug. 14, 2018); Hammond v. Chao, 383 F. Supp. 2d 47, 58 n.2 (D.D.C. 2005).

Yet even assuming that the selecting officials' immutable characteristics are relevant to the question of discrimination, their probative value is weak. The argument for considering such evidence proceeds from the untested assumption that people only discriminate against those who are (superficially) different from themselves. But this is rather thin gruel. Take sex discrimination as an example. "Evidence shows that men can exercise gendered expectations toward other men," and that "[w]omen also exercise similar gender bias toward other women." Vicki Schultz, Taking Sex Discrimination Seriously, 91 Denv. U. L. Rev. 995, 1104 n.571 (2015). Female-against-female bias can be particularly acute in male-dominated professions or when the position at issue is supervisory. See, e.g., Kim M. Elsesser & Janet Lever, Does Gender Bias Against Female Leaders Persist? Quantitative and Qualitative Data from a Large-Scale Survey, 64 Hum. Relations 1555, 1567 (2011) (finding that workers are significantly more likely to report that they would prefer a male boss to a female one, and that women are even more likely than men to prefer a male boss); Ramit Mizrahi, Note, "Hostility to the Presence of Women": Why Women Undermine Each Other in the Workplace and the Consequences for Title VII, 113 Yale L.J. 1579, 1595 (2004) ("[G]endered job expectations also influence how women perceive themselves and other women who hold traditionally male jobs.").

Therefore, to assume that men will discriminate against women, but that other women will not, defies reality. "There are many reasons why women . . . might tolerate discrimination against members of their own class, or why they might participate in discriminatory acts themselves." Johnson v. Advocate Health & Hosps. Corp., 892 F.3d 887, 908 (7th Cir. 2018). The same can be said of older employees engaging in age discrimination. See Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 574 (6th Cir. 2003). The government has provided no account of why Tillery's age and Swineford's gender should weaken Stoe's case; it merely points out those characteristics, cites a few cases, and implies that this is enough to prove the government's point. See Def.'s Mem. at 25. This sort of conclusory logic does little to convince the Court of an already shaky proposition. The Court will therefore heed the Supreme Court's admonition of two decades ago: "Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (citation omitted). Fortunately for the government, however, no such presumption is needed to aid its case here.

*     *     *

Looking at the evidence as a whole, the Court finds that it is insufficient to convince a reasonable jury to rule in Stoe's favor. Stoe puts forward some peripheral evidence to suggest that she has not been sufficiently recognized for her work over the years, and that the 2014 promotion process was somewhat haphazard—even, perhaps, that it gave her short shrift. But "[e]ven if a court suspects that a job applicant 'was victimized by poor selection procedures' it may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" Fischbach, 86 F.3d at 1183 (citation omitted). "Those are business decisions for [the employer] to make—wisely or not." Ranowsky, 2018 WL 3894287, at *8. To the extent that one could infer

from Stoe's evidence that Tillery's actions disadvantaged her, it still does not raise an inference that discrimination was the cause of those actions. Indeed, the evidence in the record also establishes that Tillery got Stoe an interview, and that he went out of his way to help another sexagenarian female candidate who he felt was ideal for the job. Moreover, there is no credible evidence that Tillery improperly influenced the other interview panelists, and those panelists also chose Greene for the job based on his interview performance. As no reasonable jury would find on this record that Tillery (or anyone else) was motivated by gender or age discrimination in denying Stoe the Division Director position, the Court will grant summary judgment in favor of the government. See Brady, 520 F.3d at 494.

## CONCLUSION

By all accounts, Debra Stoe is a credit to OST and to the government. As her supervisors stated in their 2012 request for a desk audit, "[h]er leadership and revolutionary transformation of a moribund program has demonstrated capabilities that the agency never before experienced and has obtained previously unattainable goals and objectives." Desk Audit Request at 524. This is the sort of work that is often rewarded with a raise or promotion. But it is not this Court's job to tell employers how to do theirs. The Court's role is limited to policing discrimination. And here, Stoe's evidence for gender or age discrimination is insufficient to reach a jury. For the foregoing reasons, then, the government's motion for summary judgment will be granted. A separate order will be issued on this date.

_____
/s/
JOHN D. BATES
United States District Judge

Dated: August 28, 2018